2002 UT 45

**STATE of Utah, Plaintiff and Appellee,**

v.

**Darryl HUBBARD, Defendant and Appellant.**

No. 20000233.

Supreme Court of Utah.

April 30, 2002.

---

Janet Miller, Stephen R. McCaughey, Salt Lake City, for defendant.

Mark L. Shurtleff, Att'y Gen., Karen A. Klucznik, Asst' Att'y Gen., Salt Lake City, for plaintiff.

WILKINS, Justice.

¶1 Defendant Darryl Hubbard appeals his convictions of aggravated robbery, aggravated burglary, and aggravated assault. He argues that (1) the trial court should have allowed an expert witness to testify regarding the fallibility of eyewitness identification; (2) the trial court erred in denying his pretrial motion to suppress witness identification testimony because the pretrial photo array presented to the witnesses who identified him was impermissibly suggestive and unreliable and therefore violative of the due process clauses of the United States and Utah constitutions; and (3) the trial court erred in conducting voir dire of prospective jurors at sidebar out of the defendant's presence and off the record. We affirm.

## FACTUAL BACKGROUND

[1, 2] ¶2 We review the record facts in a light most favorable to the jury's verdict. *E.g., State v. Evans,* 2001 UT 22, ¶2, 20 P.3d 888; *State v. Vargas,* 2001 UT 5, ¶2, 20 P.3d 271. We present conflicting evidence only as necessary to understand issues raised on appeal. *E.g., State v. Holgate,* 2000 UT 74, ¶2, 10 P.3d 346.

¶3 On the evening of January 24, 1999, Jeffrey Gunderson and several guests were in the living room area of Gunderson's basement apartment smoking marijuana. Cheryl Moss, who was also in the apartment but not smoking marijuana, was in a back room drawing and listening to music. Gunderson and his guests heard a loud knock at the door. One guest, Ayza Wells, ascended the interior stairway of about ten stairs that led to the door to answer it. The person at the door identified himself as "Six Nine." Wells refused to open the door, and returned, stating that he didn't know anyone called "Six Nine." Gunderson then went to the door where the person again identified himself as "Six Nine." Even though Gunderson did not know anyone by the name of "Six Nine," he opened the door.

¶4 The assailant then forced his way into the apartment, wielding a handgun which he pointed at Gunderson, shooting him in the leg below the knee. Gunderson lost his balance and fell down the stairs to the living room area. The assailant descended the stairs, grabbed Gunderson by the hair, and placed the pistol to Gunderson's head. The assailant then demanded guns, drugs, and cash from two safes that Gunderson had in the apartment. In particular, the assailant stated he knew one safe was behind Gunderson's bar.

¶5 Having heard the gunshot, Moss entered the living room area carrying a knife. Upon seeing that the assailant was armed, however, Moss set the knife down on a bookshelf. Gunderson's guests took cover, hiding in various locations inside the apartment. The assailant threatened Moss at gunpoint and ordered her into the kitchen where he duct-taped her arms behind her back and ordered her to the floor. The assailant then again demanded access to the safes.

¶ 6 After returning to the living room, the assailant threatened the three guests, took an unloaded weapon from one of them, and repeated his demands regarding the safes. Moss retrieved keys for Gunderson who unlocked the safe behind the bar, and the assailant took the cash and marijuana inside. The assailant demanded more money. Gunderson removed his wallet and offered the money to the assailant, pleading with him not to shoot. The assailant took the money and then demanded access to the other safe. The assailant proceeded to drag Gunderson by the hair to the bedroom, but then left the bedroom and fled the apartment.

¶ 7 Within thirty minutes of the time the assailant fled, the police arrived. Gunderson and Moss told police that they had been attacked and robbed by an individual who identified himself as "Six Nine." Gunderson and Moss also described the assailant to police as a tall, African–American male of strong build, and of medium to light complexion, with a goatee-style beard. With this information Officer Merino obtained a photo from the Salt Lake County Sheriff's Office of a person who used the moniker "Six Nine," and whose photograph matched the description given by the victims. Merino prepared a photo array of six photographs: five photos of light-complected African–American men with goatee-style beards similar to defendant's beard, and defendant's photo.

¶ 8 Approximately three weeks after the incident, Officer Merino presented the photo array separately to Gunderson and Moss. Officer Merino met Gunderson and Moss in the parking area behind Gunderson's apartment. Officer Merino instructed Moss to stand near the apartment building, approximately fifty feet away, while he presented the photo array first to Gunderson. Officer Merino explained to Gunderson that he was going to show him six photos, that the assailant might or might not be pictured in one of the photos, that the hair and facial hair might be different, and that the lighting of the photo might alter the skin tone. Officer Merino further explained to Gunderson that he should look at all of the photos, without looking on the back of the photos where

personal information was located, and then indicate if he recognized one of the photos as the assailant. Gunderson, immediately, and without equivocation, identified defendant as the assailant. Officer Merino also asked Gunderson to assign a numerical value from one to ten indicating his certainty, with ten being positively certain. Gunderson never assigned a numerical value, but stated instead, "I'm positive." Officer Merino then sent Gunderson to stand near the apartment building while Moss approached and looked at the photos. Merino instructed Moss as he instructed Gunderson. Moss immediately identified defendant. Moss indicated her certainty as seven on the same ten point scale.

¶ 9 Before trial, defendant moved to suppress the eyewitness identification testimony to be offered by Gunderson and Moss. This motion was denied. Defendant also moved to allow an expert witness to testify regarding the fallibility of eyewitness identification testimony. The district court held a hearing on September 2, 1999, at which counsel argued whether the testimony was admissible under Utah Rule of Evidence 702 and *State v. Rimmasch,* 775 P.2d 388 (Utah 1989). Both sides also argued whether a jury instruction would sufficiently educate the jury regarding common misconceptions about potential deficiencies of eyewitness identification. Furthermore, as part of the motion, defense counsel explained the following as the substance of the proposed expert witness testimony:

> The expert testimony that defendant seeks to admit to the Court at trial in this matter pertains to research and theory concerning memory, the reporting of memory, and the variables known to influence memory and memory reports. The testimony is designed to provide scientific information that may assist the trier of fact in interpreting contested adjudicated facts; statements of witnesses as to who and what they saw and happened.[1]

¶ 10 The district court denied defendant's motion. In denying the motion, the court noted that permitting expert testimony in this case was not "required or advisable,"

1. In the written motion, defense counsel specifically presented the following as the expert's proffered testimony:

that instruction of the jury regarding problems with eyewitness identification is "best accomplished through instruction," and that if the court were to permit expert testimony, it "would have a significant tendency to cause the jury to abdicate its role as fact finder, at least with respect to any issues that must be decided based on eyewitness testimony."

¶ 11 The case proceeded to trial. During the jury selection process, the judge, prosecutor, and defense counsel discussed matters with prospective jurors at sidebar, without the defendant present. There is no evidence in the record that defendant objected to or opposed not being present at sidebar. During the trial, both Gunderson and Moss identified the defendant as their assailant. In instructing the jury, the trial court gave an extensive *Long*[2] instruction.[3]

¶ 12 The jury convicted defendant of aggravated robbery, aggravated assault, and aggravated burglary. Defendant appeals.

> (1) Reliable studies show that there is a weak correlation between witness confidence and reliability of identification. Yet most lay persons believe that the more certain the identification, the more reliable the identification.
> Jurors over-believe eyewitnesses, have difficulty reliably differentiating accurate from inaccurate eyewitnesses and are not adequately sensitive to aspects of witnessing and identification conditions. A recent study also found that a major source of juror unreliability is reliance on witness confidence, which is a dubious indicator of eyewitness accuracy even when measured at the time an identification is made. Further, expert psychological testimony on the factors that influence eyewitness memory appears to reduce juror reliance on confidence and enhance use of other factors known to affect memory.
> (2) Contrary to average juror expectations, stress actually decreases rather than increases accuracy of perception, with subsequent distortion of recall.
> (3) Empirical studies have demonstrated that pooling of information by eyewitnesses poses a danger that a witness' memory of the perpetrator will be unduly influenced by the recall of other participants involved in the pool, resulting in an identification which is not based upon the individual memory of the witness but rather upon the group determination of the features of the perpetrator.
> (4) Studies support the existence of a phenomenon called "photo bias identification" if the witness has created a composite picture, and a mental process called "blending" which can reinforce the composite if there have been subsequent photo identifications....
> (5) The photographic lineup process itself contains a high degree of suggestibility which is not generally understood by lay persons....
> (6) Memory is not a static concept but is continually changing, as influenced by subsequent events, the mind's need to fill in memory gaps, and by suggestion, both overt and subtle. Most lay [persons] do not understand the constructive process involved in memory....
> (7) Studies show that there is a phenomenon known as the "forgetting curve," i.e., the effect of time on memory as it relates to identification. Memory weakens at a non-constant rate with the passage of time, with most of the forgetting taking place within the first hours following the event....
> (8) An initial identification made by an eyewitness may influence that eyewitness's later identifications and perceived memories of the event. Several reliable studies have shown that once an identification is made from a photo spread, an eyewitness may make an erroneous in-court identification based upon the face initially identified in the photo spread....

(internal citations to published papers omitted).

**2.** *State v. Long*, 721 P.2d 483 (Utah 1986).

**3.** The cautionary instruction given by the trial judge is as follows:

> One of the most important questions in this case is the identification of the defendant as the person who committed the crime. The prosecution has the burden of proving beyond a reasonable doubt, not only that the crime was committed, but also that the defendant was the person who committed the crime. If, after considering the evidence you have heard from both sides, you are not convinced beyond a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.
> The identification testimony that you have heard was an expression of belief or impression by the witness[es]. To find the defendant not guilty, you need not believe that the identification witness was insincere, but merely that the witness was mistaken in his/her belief or impression.
> Many factors affect the accuracy of identification. In considering whether the prosecution has proved beyond a reasonable doubt that the defendant is the person who committed the crime, you should consider the following:
> 1. Did the witness have an adequate opportunity to observe the criminal actor? In answering this question, you should consider:
> (a) the length of time the witness observed the actor;
> (b) the distance between the witness and the actor;
> (c) the extent to which the actor's features were visible and undisguised;

## ANALYSIS

### I. EXPERT EYEWITNESS IDENTIFICATION TESTIMONY

¶ 13 Defendant argues the trial court's exclusion of the proffered expert testimony regarding the dangers and fallibility of eyewitness identification testimony violated his rights to due process and to present a defense. The State counters that *State v. Butterfield*, 2001 UT 59, 27 P.3d 1133, specifically resolves this issue in the State's favor. We hold that the trial court did not abuse its discretion in disallowing the testimony of defendant's proposed expert witness regarding the fallibility of eyewitness identification.

¶ 14 "Whether expert testimony on the inherent deficiencies of eyewitness identification should be allowed is within the sound discretion of the trial court." *Butterfield*, 2001 UT 59 at ¶ 43, 27 P.3d 1133 (citing, inter alia, *State v. Malmrose*, 649 P.2d 56, 61

(d) the light or lack of light at the place and time of observation;
(e) the presence or absence of distracting noises or activity during the observation;
(f) any other circumstances affecting the witness' opportunity to observe the person committing the crime.
2. Did the witnesses have the capacity to observe the person committing the crime? ...
In answering this question, you should consider whether the witness is of a different race than the criminal actor. Identification by a person of a different race may be less reliable than identification by a person of the same race.
3. Was the witness sufficiently attentive to the criminal actor at the time of the crime?
In answering this question, you should consider whether the witness knew that a crime was taking place during the time he/she observed the actor. Even if the witness had adequate opportunity and capacity to observe the criminal act, he/she may not have done so unless he/she was aware that a crime was being committed.
4. Was the witness' identification of the defendant completely the product of his own memory?
In answering this question, you should consider:
(a) The length of time that passed between the witness' original observation and his identification of the defendant;
(b) the witness' capacity and state of mind at the time of the identification;
(c) the witness' exposure to opinions, descriptions of identifications given by other

(Utah 1982)); *see also State. v. Griffin*, 626 P.2d 478, 481 (Utah 1981). Because the admission of expert testimony on the reliability of eyewitness identification may not be improper in all instances, we noted parenthetically in *Butterfield* that the admission of eyewitness identification testimony is conditional. *Butterfield*, 2001 UT 59 at ¶ 43, 27 P.3d 1133 (quoting 31A Am.Jur.2d *Expert and Opinion Evidence* § 370 (1989)). We have not adopted a per se rule of inadmissibility of expert testimony regarding eyewitness identification. Instead, we recognize that whether to allow proffered expert testimony regarding eyewitness identification testimony is a matter best left to the trial court's discretion because of the trial court's superior position to judge the advisability of allowing such testimony.

¶ 15 Certainly a defendant may have witnesses, including expert witnesses, testify on his or her behalf. Whether testimonial evidence is admitted, however, including the testimony of an expert witness, is

witnesses, to photographs or newspaper accounts, or to any other information or influence that may have affected the independence of his/her identification;
(d) any instances when the witness, or any eyewitness to the crime, failed to identify the defendant;
(e) any instances when the witness, or any eyewitness to the crime, gave a description of the actor that is inconsistent with the defendant's appearance;
(f) the circumstances under which the defendant was presented to the witness for identification.
You may take into account that an identification made by picking the defendant from a group of similar individuals is generally more reliable than an identification made from the defendant being presented alone to the witness.
You may also take into account that identifications made from seeing the person are generally more reliable than identification made from a photograph.
I again emphasize that the burden of proving that the defendant is the person who committed the crime is on the prosecution. If, after considering the evidence you have heard from the prosecution and from the defense, and after evaluating the eyewitness testimony in light of the considerations listed above, you have a reasonable doubt about whether the defendant is the person who committed the crime, you must find him not guilty.

controlled by the trial judge. Proffered expert testimony about the deficiencies in the identification testimony of one or more percipient witnesses presents a dilemma. If the expert witness is permitted to testify, he or she will evaluate for the jury, either directly or indirectly, to what extent the percipient witness testimony should be believed. Permitting an expert witness, either directly or indirectly, to analyze the credibility of a percipient witness for the jury and thereby opine regarding whether eyewitness testimony is reliable or not, to a certain extent, steps into the province of the jury, *see* Gregory G. Sarno, Annotation, *Admissibility, At Criminal Prosecution, of Expert Testimony on Reliability of Eyewitness Testimony*, 46 A.L.R.4th 1047 § 3[a]; 31A Am.Jur.2d *Expert and Opinion Evidence* § 371 n. 71 (1989), and in our judicial system it is the role of the jury to decide how much weight to give the testimony of particular witnesses, not the role of independent experts. On the other hand, if a proposed expert witness is not permitted to testify about the limitations inherent in eyewitness identifications, the jury might not be educated about the potential deficiencies of eyewitness identification, and it will fall upon the court to instruct the jury on the limitations and problems that research has discovered.

¶ 16 In *Butterfield* this court acknowledged the limitations inherent in eyewitness testimony, and we reiterated that because of these inherent deficiencies "trial courts are required to give a cautionary jury instruction when eyewitness identification 'is a central issue in a case and such an instruction is requested by the defense.' " 2001 UT 59 at ¶ 42, 27 P.3d 1133 (quoting *State v. Long*, 721 P.2d 483, 492 (Utah 1986)). In *Butterfield* we stated, "the calling of expert witnesses to testify as to matters which would apply to any crime or any trial does not in the true sense offer testimony of a witness who has knowledge of the facts of the case. Rather, it would be in the nature of a lecture to the jury as to how they should judge the evidence." *Id.* at ¶ 43. We then reiterated that

a trial court's refusal to admit evidence would not constitute an abuse of discretion when proffered expert testimony would amount to a lecture to the jury as to how they should weigh testimonial evidence. *Id.*

¶ 17 In some cases, to permit one expert to analyze circumstances present when an eyewitness observed a defendant and suggest how accurate an eyewitness' identification is would undoubtedly result in a similar analysis by an opposing expert who would analyze the same circumstances and offer a contrary opinion. Such expert testimony, regardless of whether it is presented hypothetically or by applying the circumstances of a particular case, will result in dueling experts evaluating for the jury how much weight to give to the testimony of percipient witnesses. In some cases, the proffered testimony might be a lecture to the jury regarding the scientific bases and research underlying the weaknesses inherent in eyewitness identification. Therefore, it is left to the trial court's sound discretion to decide whether the proffered expert testimony would constitute a lecture, the substance of which can be just as adequately conveyed to the jury through the judge in a jury instruction, as opposed to through expert testimony.

¶ 18 If the trial court determines that the better result would be to educate the jury through a *Long* instruction, counsel are certainly able to present proposed *Long* instructions that explain the potential effects of certain circumstances on the powers of observation and recollection and present their positions on how the *Long* cautionary instruction should be given.

¶ 19 In this case the trial court gave a cautionary *Long* instruction instead of permitting expert testimony regarding eyewitness identification.[4] The jury instruction could have better explained the substance of the proffered expert testimony, *supra*, n. 1, namely the research and scientific principles underlying the limitations of eyewitness identification. *See Long*, 721 P.2d at 488–494 (providing an overview of scientific research

---

4. By noting the instruction given by the trial judge in this case we do not suggest that the instruction was ideal. Despite the examples given in *Long*, we have not adopted one specific instruction as the only formulation, but have granted trial courts and counsel a measure of latitude in formulating such instructions. *Long*, 721 P.2d at 492.

on the unreliability of eyewitness identification). Nevertheless, such proffered expert testimony is the type of lecture testimony that, in cases such as these, can be adequately conveyed to the jury through an instruction.

■ ¶ 20 "[A] trial court's determination that expert testimony would amount to a lecture to the jury as to how they should judge the evidence, and its subsequent refusal to admit such testimony into evidence 'is not an abuse of discretion, particularly where there has been no showing that the excluded evidence would probably have had a substantial influence in bringing about a different verdict.'" *Butterfield,* 2001 UT 59 at ¶ 43, 27 P.3d 1133 (quoting *State v. Malmrose,* 649 P.2d 56, 61 (Utah 1982)). Arguably, had the eyewitness identification expert testified the verdict *might* have been different because the substance of the proffered testimony— research and theory concerning memory, the reporting of memory, and the variables known to influence memory and memory reports—was not part of the *Long* instruction given. However, the trial court correctly found that the proffered expert testimony would amount to a lecture to the jury as to how they should judge the evidence, noting that the proffered testimony "would, in fact, merely lecture the jury," and that it would "have a significant tendency to cause the jury to abdicate its role as fact finder...." Moreover, we are not convinced that the expert's proffered testimony would *probably* have had a substantial influence in bringing about a different verdict. In the cautionary instruction the court admonished the jury to evaluate whether the witnesses' identification of the defendant was the product of their memory, asking them to consider the length

between the incident and the photo array identification, the witnesses' capacities, the witnesses' exposure to opinions and descriptions of identifications given by other witnesses, whether any eyewitness gave a description inconsistent with the defendant's appearance, and the circumstances of the photo array presentation in the parking lot. Although this instruction was not ideal, it tracks one of the proposed instructions in *Long.*[5] Its failings do not disqualify it from use, and it satisfies "our expressed concerns about the need for cautionary instructions." *Long,* 721 P.2d at 495. We continue to trust, however, that trial courts will be able to specifically tailor instructions other than those offered in *Long* that address the deficiencies inherent in eyewitness identification. *Id.* Accordingly, we hold that the trial court did not abuse its discretion in refusing the expert testimony and in giving the instruction it did.

## II. MOTION TO SUPPRESS WITNESS IDENTIFICATIONS

■ ¶ 21 Defendant contends the trial court violated his right to due process guaranteed by the Fourteenth Amendment of the United States Constitution and article I, section 7 of the Utah Constitution in denying his motion to suppress the identification testimony of Gunderson and Moss. Defendant argues that, pursuant to the federal due process standard, the pretrial photo array presented to them was impermissibly suggestive. He also contends that the identifications violated the Utah due process standard because they were unreliable, especially because the witnesses' mental faculties were impaired by marijuana. The State in-

5. After discussing the published research on the deficiencies of eyewitness identification, *Long* notes that a proper instruction "should sensitize the jury to the factors that empirical research have shown to be of importance in determining the accuracy of eyewitness identifications, especially those that laypersons most likely would not appreciate." 721 P.2d at 492. The factors listed in the proposed instructions in *Long,* 721 P.2d at 493–95 nn. 7 & 8, are examples of factors that should be explained as part of the instruction. The instruction should be tailored, however, to the particular case. The jury should not simply be provided these factors

without being instructed on how such factors are commonly misunderstood. Without an explanation from the court of how certain factors are commonly misunderstood, a list of factors to be considered is not particularly instructive on the deficiencies of eyewitness identification. The second and third-to-last paragraphs of the *Long* instruction given in this case are good examples of the type of instructions that educate the jury by not only providing factors to be considered, but by also concisely explaining why they are commonly misunderstood factors of eyewitness identification.

sists that the photo array was not impermissibly suggestive and therefore not violative of federal due process. The State also advocates that the witnesses' testimony about the photo array was reliable because Gunderson and Moss had an opportunity to view the assailant, because Moss was not under the influence of marijuana, and because the two witnesses independently identified the defendant. We hold that the photo array was reliable and not impermissibly suggestive and therefore not violative of the Utah or United States Constitutions. Because the witnesses' testimony was reliable and based on untainted, independent foundations, it was not error by the trial court to deny defendant's motion to suppress and admit testimony of the photo array identifications.

¶ 22 The standard for reviewing a trial court's decision to admit eyewitness identification testimony requires us to consider the record evidence and determine whether the admission of the identification is consistent with the due process guarantees of the Fourteenth Amendment of the United States Constitution and article I, section 7 of the Utah Constitution. *State v. Ramirez,* 817 P.2d 774, 781 (Utah 1991). Whether a pretrial photo array violates a citizen's constitutional right to due process is a question of law, which we review for correctness. *Id.* at 781 n. 3. At the same time, however, because this question of law requires the application of the record facts to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations. *Id.* We apply this same standard of review to both the federal and the state analyses.

## A. Federal Due Process

¶ 23 The linchpin of determining whether the admission of eyewitness identification testimony violates the federal Due Process Clause is reliability. *Manson v. Brathwaite,* 432 U.S. 98, 113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Where witnesses have identified a defendant in a pretrial photo array, we apply a two-part test in determining the reliability of the identification. *State v. Lopez,* 886 P.2d 1105, 1111 (Utah 1994); *State v. Thamer,* 777 P.2d 432, 435 (Utah 1989). We must determine, given the totality of the circumstances, whether the pretrial photo identification procedure used by law enforcement unduly tainted the in-court identifications, that is, whether the procedure used was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Lopez,* 886 P.2d at 1111 (quoting *Thamer,* 777 P.2d at 435 (citing *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968))). If the photo array was impermissibly suggestive, a subsequent in-court identification may still be admissible, but it "must be based on [an] untainted, independent foundation to be reliable." *Lopez,* 886 P.2d at 1111 (quoting *Thamer,* 777 P.2d at 435 (citing *Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243)).[6]

¶ 24 The pretrial identification procedures used by Officer Merino in this case were not impermissibly suggestive. As a result, irreparable misidentification was not substantially

---

6. Under the federal test, the first question is whether the pretrial photographic identification procedure tainted the subsequent in-court identification because the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Lopez,* 886 P.2d at 1111 (citation omitted). If the photo array was impermissibly suggestive, any in-court eyewitness identification must be based on an untainted and independent foundation to be reliable. *Id.* If the pretrial procedure was impermissibly suggestive, the factors to be weighed against the corrupting effect of the impermissibly suggestive procedure include the following five factors set forth by the United States Supreme Court: (1) the opportunity of the witness to view; (2) the witness' degree of attention; (3) the accuracy of the witness' description; (4) the witness' level of certainty; (5) the time between the crime and the confrontation. *See Manson v. Brathwaite,* 432 U.S. 98, 113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *see also State v. Thamer,* 777 P.2d 432, 436 (Utah 1989); *but see State v. Ramirez,* 817 P.2d 774, 779 (Utah 1991) (suggesting that the federal due process standard always involves a preliminary determination of whether an eyewitness identification is sufficiently reliable to be permitted to be presented to the jury, regardless of whether the pretrial procedure was impermissibly suggestive).

likely. The photo array did not emphasize defendant's photo over the others. *See Lopez*, 886 P.2d at 1111. The photos Officer Merino assembled were all photos of African–American males with light complexions and goatees. Some appear to have somewhat different skin tones, and the amount and style of facial hair differ somewhat among the photos. Nonetheless, Officer Merino presented Gunderson and Moss with six photos of light-complected African–American males, all of whom had similar goatee-style beards. Also, defendant's photo was neither first nor last in the group presented to the witnesses. Officer Merino further explained to the witnesses that the assailant might or might not have been included in the group presented, that the hair and facial hair of the individuals photographed might have been different from how they looked at the time the photo was taken, and that the lighting of the photo might have altered actual skin tone. Moreover, Officer Merino ensured that the two witnesses viewed the photos separately. Neither Gunderson nor Moss was permitted to stand near the other while he or she was viewing the photos. Gunderson stood near the apartment building and away from Moss while she viewed the photos, and Moss stood near the apartment building and away from Gunderson when he looked at the photos. Given these procedures, the pretrial photo identification procedure did not taint the in-court identifications. The procedure was not impermissibly suggestive, and we therefore conclude the identifications were reliable and federal due process was not violated. As a result, we need not, and do not, address whether the subsequent in-court identifications were sufficiently based on untainted, independent foundations to be reliable.

### B. Utah Due Process

¶ 25 The standard for determining whether defendant's right to due process as guaranteed by article I, section 7 of the Utah Constitution was denied is whether, under the totality of the circumstances, the identifications were reliable. *See State v. Hollen*, 2002 UT 35, ¶ 26, 44 P.3d 794; *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991) ("The ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable."). In *Long*, this court "laid the foundation for a separate Utah constitutional due process analysis of the reliability of eyewitness identifications," *Ramirez*, 817 P.2d at 779 (construing *Long* ), and in *Ramirez* we explained "the analytical model to be used by a trial court in determining the admissibility of arguably suggestive eyewitness identifications under article I, section 7, the Utah due process provision." 817 P.2d at 779. In Utah, the analysis for determining whether an in-court identification has been unduly tainted by an out-of-court identification such that it violates due process is two-fold: Utah courts examine the procedural actions taken by law enforcement officials in assembling and presenting a photo array to witnesses for due process, and Utah courts also make a preliminary determination on whether the identification is sufficiently reliable such that its admission and consideration by the jury will not violate defendant's right to due process. *See id.* at 780.

¶ 26 With respect to the first step of the state due process analysis, for the reasons outlined previously, *see supra* ¶ 24, we conclude that the procedural actions taken by Officer Merino in assembling and presenting the photo array were not impermissibly suggestive. With respect to the second step, trial courts have a critical responsibility to scrutinize proffered evidence for constitutional defects, and failure to do so "would leave protection of constitutional rights to the whim of a jury and would abandon the courts' responsibility to apply the law." *Ramirez*, 817 P.2d at 778. The danger of abdicating this responsibility in cases where eyewitness identification is an issue is great because of the probability that such evidence, "even though thoroughly discredited[,] has a powerful effect on a jury." *Id.* at 779 (citing *Long*, 721 P.2d at 490). Even if law enforcement procedures are appropriate and do not violate due process, eyewitness identification testimony must still pass the gatekeeping function of the trial court and be subject to a preliminary determination—whether the identification is sufficiently reliable to be presented to the jury. *Id.* at 778–79.

¶ 27 Since *Long* we have used five factors as a test for analyzing, as a preliminary constitutional matter, whether an eyewitness identification is sufficiently reliable to be presented to the jury. *See, e.g., Hollen,* 2002 UT 35, ¶¶ 26–63, 44 P.3d 794; *State v. Hoffhine,* 2001 UT 4, ¶ 18, 20 P.3d 265 (quoting *Ramirez,* 817 P.2d at 781 (quoting *Long,* 721 P.2d at 493)); *State v. Decorso,* 1999 UT 57, ¶ 42, 993 P.2d 837 (quoting *Long,* 721 P.2d at 493). The factors are as follows:

> (1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness' capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly.

*Long,* 721 P.2d at 493. While these factors provide guidance, the list is certainly not an exhaustive or exclusive list of factors that may be considered in determining whether an identification is reliable, and, therefore, not violative of due process.

¶ 28 We conclude that the pretrial photo identification was sufficiently reliable such that defendant's due process rights were not violated by permitting the identification testimony of Gunderson and Moss. Both Gunderson and Moss had an adequate opportunity to view the assailant. Gunderson had an opportunity to view the assailant initially at the door, then later in the living room when the assailant demanded access to the safes, and in the bedroom where the assailant had directed Gunderson before fleeing. The attention of both Gunderson and Moss was focused on the assailant. Whether their attention was focused on the features of the assailant or whether their vision was blurred by fear or other factors is debatable, but it is clear that the focus of the witnesses attention was not on another event or occurrence such that the assailant was not the focus of their attention. They were not casual or passing observers. The witnesses' capacity to observe the event, particularly their physical and mental acuity, is debatable. Gunderson was smoking and under the influence of marijuana; Moss had not been smoking marijuana. The witnesses' identification was made spontaneously and remained consistent thereafter. Gunderson, according to Officer Merino, identified defendant as the assailant immediately, and without hesitation or equivocation. When asked to describe his certainty to Officer Merino, Gunderson said, "I'm positive." Moss immediately identified defendant and indicated her level of certainty as seven on the ten point scale. Officer Merino's procedures militate against concluding that the witnesses' identification was the product of suggestion. Officer Merino took care not to suggest that the witnesses identify one photo over another: he did not place defendant's photo first or last; he required Gunderson and Moss to look at the pictures separately; and he explained to both of them that the assailant might or might not be in the array, that the hair and facial hair might have changed, and that the photo lighting might have altered skin tones. Finally, the nature of the event being observed and the likelihood that the witnesses would perceive, remember and relate it correctly does not clearly influence us either way. Whether a traumatic event helps or hinders in identification is debatable.

¶ 29 In addition to the *Long* factors, we note that the witnesses provided accurate descriptive information to investigating officers which Officer Merino used to assemble the photo array: the approximate height, build, complexion, and facial hair of their assailant. In particular, Gunderson and Moss provided officers with the moniker the assailant used to identify himself, "Six Nine," and Officer Merino used this information in particular to obtain a photograph of defendant from the Salt Lake County Sheriff's Office.

¶ 30 We cannot know for certain whether the witnesses' attention was completely focused on identifying features of the assailant, nor can we determine whether the witnesses were mentally and physically sharp. Whether, because of the nature of the event the

witnesses in this case were more perceptive or less perceptive, is also a point of debate. Our determination, however, is only whether the proffered evidence is sufficiently reliable such that it can be presented to the jury for their deliberation. Courts need not, nor should they, step into the province of the jury and decide the ultimate matter of identification for the jurors. Courts must simply decide whether the testimony was sufficiently reliable so as not to offend defendant's right to due process by permitting clearly unreliable identification testimony before the jury. In sum, given the above facts, the witness identifications were not so unreliable as to warrant exclusion of the identification testimony from consideration by the jury. As a result, we hold that admission of the identification testimony of Gunderson and Moss did not violate defendant's state constitutional right to due process.

## III. DISCUSSIONS WITH POTENTIAL JURORS AT SIDEBAR OUT OF DEFENDANT'S PRESENCE AND OFF THE RECORD

¶ 31 Defendant insists he has a right to be present at every stage of the proceedings and that the trial court erred in conducting off-the-record discussions at sidebar with potential jurors. Defendant claims that because article I, section 12 of the Utah Constitution and section 77–1–6 of the Utah Code entitle him to be present at all stages of trial, he was entitled to be present at the off-the-record sidebar discussions, and waiver of this right may not be presumed. The State counters that defendant waived any right he had to be present at sidebar during voir dire of prospective jurors by failing to assert it. We agree.

¶ 32 Because defendant did not raise, by objection or otherwise, his right to be present during voir dire, we review whether the defendant was denied this alleged right under a plain error standard. *See, e.g., State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). In general, to establish plain error and obtain relief from an alleged error that was not properly objected to at trial, an appellant must demonstrate: (1) an error exists; (2) the error should have been obvious to the trial court; and (3) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome, or phrased differently, our confidence in the verdict is undermined. *Id.* at 1208–09.

¶ 33 A defendant charged with a crime is entitled to be present at all stages of trial. Utah Const. art. I, § 12 ("In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel ... to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed[.]"); Utah Code Ann. § 77–1–6(1) (1999) ("In criminal prosecutions the defendant is entitled: (a) To appear in person and defend in person or by counsel; ... (f) To a speedy public trial by an impartial jury of the county or district where the offense is alleged to have been committed[.]"); *State v. Houtz*, 714 P.2d 677, 678 (Utah 1986). In *State v. Glenny*, this court stated, "The right to be present at trial is conceded and guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States. (Jury selection has been determined to be a part of the trial.)" 656 P.2d 990, 992 (Utah 1982) (per curiam) (footnote citations omitted). We need not analyze whether these authorities are so broad as to guarantee a right to be present during sidebar discussions between the court and the prospective jurors, however.[7] We assume, with-

---

7. The United States Supreme Court has not expressly declared that such a specific federal due process right exists. In *United States v. Gagnon*, however, the Court explained that while the right to presence is rooted in the Confrontation Clause, the right is further protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence. 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). A defendant has a due process right to be present "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [The] presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). The *Gagnon* Court went on to hold that defendants had no right to be present during an in camera discussion between a judge, juror, and defense

out deciding the issue, for purposes of this appeal, that defendant has a right to be present at sidebar discussions with potential jurors during the jury selection process and conclude that defendant waived the right in this case.

¶ 34 We agree with the reasoning of the Wyoming Supreme Court in *Campbell v. State*, 999 P.2d 649 (Wyo.2000). In *Campbell*, the Wyoming Supreme Court determined that a defendant, who failed to object or assert her right to be present and whose attorney did attend the sidebar conferences and did not object to the court's failure to record the conferences, waived her right to be present during sidebar voir dire of potential jurors. *Id.* at 660–662. This case is strikingly similar to *Campbell*. Defense counsel for Mr. Hubbard did not assert defendant's right to be present at sidebar, nor did he object to defendant's absence at sidebar; and defense counsel, the court, the prosecutor, and the potential jurors discussed matters at sidebar off the record. As the United States Supreme Court stated in *Gagnon*, a trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend." *Gagnon*, 470 U.S. at 528, 105 S.Ct. 1482. A defendant knowing of a discussion must assert whatever right he may have to be present. *Id.* We noted in *Glenny* that "the right [to be present at trial] is not absolute and may be waived by word or act of the person claiming it," 656 P.2d at 992, and under these particular circumstances, we conclude that defendant waived his right to be present at the sidebar discussions. Because we find no error, the trial court could not have committed plain error.

## CONCLUSION

¶ 35 We hold that (1) the trial court did not exceed its permitted range of discretion in not allowing an expert witness to testify regarding the fallibility of eyewitness identifi-

cation, (2) the trial court did not err in denying the motion to suppress testimony about the pretrial photo identifications because the identification testimony regarding the photo array was not violative of the due process clauses of the United States and Utah Constitutions, and (3) the defendant waived any right he may have had to be present while the trial court conducted voir dire of prospective jurors at sidebar. As a result, the jury verdict is affirmed.

¶ 36 Affirmed.

¶ 37 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice HOWE, and Justice RUSSON concur in Justice WILKINS' opinion.

---

counsel held in response to the juror's concerns about sketches the defendant had made of the jurors. *Id.* at 527, 105 S.Ct. 1482. The selection of particular jurors, on the other hand, arguably has a reasonably substantial relation to the ful-

ness of a defendant's opportunity to defend against a charge, and a defendant's right to a fair and just hearing could be thwarted by his or her absence.