2008 UT App 205

**STATE of Utah, Plaintiff and Appellee,**

v.

**Deon Lomax CLOPTEN, Defendant and Appellant.**

No. 20060254–CA.

Court of Appeals of Utah.

May 30, 2008.

Ronald S. Fujino, Salt Lake City, for Appellant.

Mark L. Shurtleff, atty. gen., and Joanne C. Slotnik, asst. atty. gen., Salt Lake City, for Appellee.

Before GREENWOOD, P.J., THORNE, Associate P.J., and McHUGH, J.

## OPINION

McHUGH, Judge:

¶ 1 Deon Clopten appeals his conviction of murder, *see* Utah Code Ann. § 76–5–203 (Supp.2007); failure to respond to a police command, *see* Utah Code Ann. § 41–6a–210 (2005); and possession of a dangerous weapon by a restricted person, *see* Utah Code Ann. § 76–10–503(2)(a) (2003).[1] We affirm.

## BACKGROUND [2]

■ ¶ 2 Tony Fuailemaa was shot and killed on December 1, 2002, shortly after leaving a concert in Salt Lake City with his girlfriend, Shannon Pantoja.

¶ 3 Clopten also attended the concert, along with three of his friends. Clopten was dressed in red pants and a red jacket or sweatshirt. Before the concert, Pantoja exchanged greetings with a member of Clopten's group. Once inside, Fuailemaa asked Pantoja if she knew the man in the red outfit. When Pantoja stated that she did not, Fuailemaa said the man's name was Deon Clopten. Fuailemaa explained that he and Clopten had been incarcerated together and that Clopten "had had some problems with some of the homies out in the prison."

¶ 4 During the concert, four undercover police officers observed the crowd. "[T]he individual that was wearing the red suit" and his group "ha[d] some sort of a confrontation" with another group that included Fuailemaa and Pantoja. No physical blows resulted, and eventually the groups separated. Sometime later, but before the concert ended, Clopten and his group left. Shortly thereafter, Fuailemaa and Pantoja also left the concert.

¶ 5 As Pantoja and Fuailemaa exited the concert, Pantoja saw three of the four men from Clopten's group. The three men "were kind of like hiding behind—crouched behind the building" and they "peeked out and then immediately ducked back again." Fuailemaa told Pantoja, "I think I'm going to have some problems with these guys." "Then, at that moment, that's when Deon Clo[pten] came out with his arm extended. He had a gun in his hand." Pantoja heard the shooter say, "What's up now," and then she watched as Clopten shot Fuailemaa twice in the head. Clopten then ran away.

¶ 6 After hearing gun shots, one of the undercover officers attending the concert ran to Pantoja and asked, "Who did it?" Pantoja answered by saying, "It's the guy in all red." After the police arrested Clopten and his group, Pantoja identified Clopten as the shooter. Pantoja told the officer that the shooter's name was "Deon Compton." More than one year later, Pantoja again identified Clopten as the shooter during a police lineup. Pantoja also identified Clopten as the shooter during his trial.

¶ 7 Melissa Valdez also attended the concert and witnessed Fuailemaa's murder. Before the concert, Valdez talked to a group of men about getting tickets. One of the men was wearing red pants and a red sweatshirt. Like Fuailemaa and Pantoja, Valdez left the concert shortly before it was finished. As she was leaving the venue, she saw the man in the red sweat suit that she had spoken with earlier. She asked the man if he had obtained tickets, and the man indicated that he had and passed by her. Shortly thereafter, Valdez happened to look back over her shoulder. At that moment, she saw the man in red standing behind the victim with his right arm extended and holding what appeared to be a gun, and heard a gunshot. When presented with a photo array, Valdez twice identified Clopten as the shooter. She also identified Clopten as the shooter during his trial.

¶ 8 Andre Christopher Hamby, who attended the concert with Clopten and witnessed Fuailemaa's murder, also testified against Clopten.[3] Hamby testified that he,

---

1. Because Clopten's arguments on appeal do not concern the statutory language, we cite to the current code as a convenience to the reader.

2. "When reviewing a jury verdict, we recite the facts in the light most favorable to that verdict." *State v. Carreno*, 2006 UT 59, ¶ 3, 144 P.3d 1152.

3. Because Hamby was unavailable at the time of trial, his preliminary hearing testimony was read to the jury.

Clopten, and two other men approached their vehicle after they left the concert and that Clopten declared, "I'm goin' shoot him." At that point, Clopten told another member of the group to "[h]and me the gun." Hamby watched as Clopten obtained the gun, threw on the hood of his red sweatshirt, walked up to Fuailemaa, put the gun straight behind Fuailemaa's head, and, "at point-blank range," shot him twice "in the back of the head." Hamby then ran back to the vehicle with the rest of the group; once everyone was in, Clopten "took off" driving. Clopten then passed his gun to another member of the group "and told him to throw it out" the window.

¶ 9 Finally, Robert Land testified that Clopten admitted to the murder. Land knew Clopten because they previously had been cellmates. Land and Clopten were reunited in December of 2002 while Clopten was being held in prison for the current offense. It was during this period that Clopten bragged to Land about committing the murder.

¶ 10 The defense sought to introduce reasonable doubt that Clopten was the shooter. As acknowledged on appeal, its "theory of the case was misidentification or mistaken identity." Accordingly, the defense presented testimony that a different individual had admitted to being the shooter and that the man in red had entered the passenger's side of the vehicle, as opposed to the driver's side. The defense also sought to present expert testimony regarding the fallibility of eyewitness identification. The trial court excluded the testimony, but instructed the jury regarding this issue.

¶ 11 After hearing all of the evidence, the jury convicted Clopten of murder, see Utah Code Ann. § 76–5–203 (Supp.2007), and failure to respond to a police command, see Utah Code Ann. § 41–6a–210 (2005). Defense counsel submitted the charge for possession of a firearm by a restricted person to the trial court, which found him guilty, see Utah Code Ann. § 76–10–503(2)(a) (2003). Clopten now appeals.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 12 Clopten presents two issues on appeal. First, Clopten argues the trial court erred when it excluded expert testimony regarding the fallibility of eyewitness identification. " 'The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability.' " State v. Hollen, 2002 UT 35, ¶ 66, 44 P.3d 794 (alteration in original) (quoting State v. Larsen, 865 P.2d 1355, 1361 (Utah 1993)). Second, Clopten argues that he received ineffective assistance of counsel. "Ineffective assistance of counsel arguments raised for the first time on appeal are reviewed for correctness as a matter of law." State v. Vos, 2007 UT App 215, ¶ 9, 164 P.3d 1258, cert. denied, No. 20070653, 186 P.3d 347, 2007 Utah Lexis 225 (Nov. 29, 2007).

## ANALYSIS

### I. Expert Testimony

■■■ ¶ 13 Clopten first argues the trial court erred when it excluded the testimony of Dr. Dodd, an expert witness prepared to testify about the fallibility of eyewitness identification. Because of the highly deferential standard of review on this issue, we affirm the trial court's ruling.

¶ 14 " '[T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.' " State v. Long, 721 P.2d 483, 491 (Utah 1986) (quoting United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). Indeed, "[t]he literature is replete with empirical studies documenting the unreliability of eyewitness identification[, and t]here is no significant division of opinion on the issue. The studies all lead inexorably to the conclusion that human perception is inexact and that human memory is both limited and fallible." Id. at 488 (citations omitted).

¶ 15 However, "jurors are, for the most part, unaware of these problems." Id. at 490. Accordingly, the Utah Supreme Court has declared "that, at a minimum, additional judicial guidance to the jury in evaluating

such testimony is warranted." *Id.* at 492. Thus, in the absence of any reasonable tactic explaining otherwise, effective assistance requires that defense counsel request a cautionary jury instruction. *See id.; State v. Maestas (Maestas I)*, 1999 UT 32, ¶¶ 32 & n. 2, 37, 984 P.2d 376.

¶ 16 In this case, the trial court gave a specific jury instruction regarding the fallibility of eyewitness identification. The jury instruction was adopted almost verbatim from an instruction the supreme court has identified as "satisfy[ing the] expressed concerns about the need for cautionary instructions." *See Long*, 721 P.2d at 494–95 & n. 8. Clopten does not appeal his conviction based on that instruction.[4] Instead, Clopten argues the trial court erred when it excluded expert testimony that would have elaborated on the fallibility of such identification and specifically addressed some of the relevant factors in this case.

 ¶ 17 Although the supreme court created a "rigorous approach to cautionary [jury] instructions," *id.* at 488, a majority of the court has not required the admission of expert witness testimony, *see generally, e.g., State v. Maestas (Maestas II)*, 2002 UT 123, ¶ 57, 63 P.3d 621 (plurality opinion). Instead, the supreme court " 'recognize[s] that whether to allow proffered expert testimony regarding eyewitness identification testimony is a matter best left to the trial court's discretion.' " *Id.* ¶ 68 (Durrant, J., dissenting) (quoting *State v. Hubbard*, 2002 UT 45, ¶ 14, 48 P.3d 953); *accord id.* ¶ 136 (Russon, J., dissenting); *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794. Thus, "the trial court's ruling on the admissibility of expert testimony [regarding the unreliability of eyewitness identification] will stand unless the ruling 'exceeds the limits of reasonability.' " *Maestas II*, 2002 UT 123, ¶ 136, 63 P.3d 621

(Russon, J., dissenting) (quoting *Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794).[5]

¶ 18 In *State v. Hubbard*, 2002 UT 45, 48 P.3d 953, the supreme court affirmed "the trial court's exclusion of the proffered expert testimony regarding the dangers and fallibility of eyewitness identification." *Id.* ¶ 13. In that case, "the trial court gave a cautionary [jury] instruction instead of permitting expert testimony regarding eyewitness identification." *Id.* ¶ 19. Although the supreme court found shortcomings with the cautionary instruction, it affirmed. *See id.* The court held that "expert testimony is the type of lecture testimony that, in cases such as these, can be adequately conveyed to the jury through an instruction." *Id.; see also Maestas II*, 2002 UT 123, ¶ 138, 63 P.3d 621 (Russon, J., dissenting) (approving of a trial court's exclusion of expert testimony based on the defendant's ability to cross-examine the witness and to "request an appropriate jury instruction"); *State v. Brink*, 2007 UT App 353, ¶¶ 6, 11, 173 P.3d 183 (affirming trial court's decision "to educate the jury through the use of appropriate instructions instead of through expert testimony" (internal quotation marks omitted)).

¶ 19 Thus, we follow the precedent affording trial judges significant deference to exclude expert testimony on this topic. However, we note that courts and legal commentators have argued that jury instructions and cross-examinations do not adequately address the vagaries of eyewitness identification. *See, e.g., United States v. Downing*, 753 F.2d 1224, 1230 n. 6 (3d Cir.1985) ("To the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness' recol-

---

4. Clopten does contend the jury "instruction lack[ed] several important aspects" but limits any claimed error to the trial court's refusal to allow Dr. Dodd "to cover what was otherwise missing from the *Long* instruction."

5. Clopten has not pointed us to a single case that has been reversed under this highly deferential standard of review. Indeed the appellate courts of this state have consistently affirmed trial court decisions regarding the admissibility of expert

testimony on eyewitness identification. *See, e.g., Maestas II*, 2002 UT 123, ¶ 57, 63 P.3d 621 (plurality opinion) (affirming trial court's exclusion of expert testimony regarding fallibility of eyewitness identification); *State v. Hubbard*, 2002 UT 45, ¶ 35, 48 P.3d 953 (same); *State v. Butterfield*, 2001 UT 59, ¶ 48, 27 P.3d 1133 (same); *State v. Brink*, 2007 UT App 353, ¶ 1, 173 P.3d 183 (same); *State v. Kinsey*, 797 P.2d 424, 428–29 (Utah Ct.App.1990) (same).

lection of an event."); Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, Fed. Cts. L.Rev. 1, 25 (2007) ("Jury instructions do not explain the complexities about perception and memory in a way a properly qualified person can. Expert testimony ... can do that far better than being told the results of scientific research in a conclusory manner by a judge[,] especially since jury instructions are given far too late in a trial to help jurors evaluate relevant eyewitness testimony with information beyond their common knowledge." (internal quotation marks omitted)); Richard A. Wise et al., *A Tripartite Solution to Eyewitness Error*, 97 J.Crim. L. & Criminology 807, 833 (2007) ("[J]udges' instructions do not serve as an effective safeguard against mistaken identifications and convictions and ... expert testimony is therefore more effective than judges' instructions as a safeguard." (omission in original) (internal quotation marks omitted)); Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 Am.Crim. L.Rev. 1271, 1277 (2005) ("Although cross-examination is a powerful tool for exposing lies, it is not particularly effective when used against eyewitnesses who believe they are telling the truth."); Michael R. Leippe, *The Case for Expert Testimony About Eyewitness Memory*, 1 Psychol. Pub. Pol'y & L. 909, 924 (1995) ("Finally, judge's cautionary instructions also are no panacea. Current versions are inaccurate, overly broad, and easily lost amid a lengthy presentation of other closing instructions. Moreover, research ... suggests instructions do not effectively teach jurors about how to evaluate eyewitness testimony." (citations omitted)); Cindy J. O'Hagan, Note, *When Seeing Is Not Believing: The Case for Eyewitness Expert Testimony*, 81 Geo. L.J. 741, 754–55 (1993) ("Jury instructions should not be abandoned; they do have some value. But in some instances, courts have used jury instructions as an excuse to exclude expert testimony, claiming it is redundant. Because expert testimony is a more effective solution, jury instructions should be used as

a complement to the expert testimony, not as a substitute." (footnote omitted)); Fredric D. Woocher, Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan. L.Rev. 969, 994–95 (1976) ("[T]he witness on cross-examination will not and cannot reveal the factors that may have biased the identification, for many of these influences operate unconsciously."); *id.* at 1002–05 ("Although special cautionary instructions regarding the unreliability of eyewitness testimony take a step in the right direction, they probably do not provide much protection against conviction of the innocent.").

¶ 20 The precise situation in this case is somewhat different than the cases discussed in these articles. Three of the eyewitnesses here were not complete strangers to Clopten at the time of the shooting. Hamby attended the concert with Clopten, saw the murder, and rode with Clopten in the get-away vehicle. Valdez had a conversation with Clopten earlier in the evening. Moments before the shooting, Valdez recognized Clopten and made a reference to the prior conversation which he acknowledged. She then heard the shots and turned her head in time to see Clopten holding the gun that had just been fired into the victim's head. Finally, the victim's girlfriend, Pantoja, learned Clopten's name, observed the confrontation between her date and Clopten earlier in the evening, saw Clopten shoot Fuailemaa, and identified the shooter to police by description and by name. She then identified him again at the time of his arrest one year later during an in-person lineup, and during his trial. Consequently, even if admission of expert testimony on this issue were required, we would conclude there was no prejudicial error in this case.

¶ 21 Following existing Utah precedent, we hold the trial court did not exceed its discretion when it excluded Dr. Dodd's testimony. The trial court carefully and repeatedly considered the proposed testimony, the facts of this case, and the cautionary jury instructions.[6] Ultimately, the trial court excluded

---

6. The trial court considered Dr. Dodd's testimo-

ny at least four times. Clopten argues the trial

the testimony because "the eyewitness [jury] instruction does an adequate job" and because the trial court thought "that Dr. Dodd's testimony ... would only confuse the issue." Indeed, the trial court ruled "Dr. Dodd's testimony [wa]s just superfluous and would have no bearing on the jury's decision." The trial court's reasoning essentially mirrors that affirmed by the supreme court in *Hubbard. See* 2002 UT 45, ¶ 19, 48 P.3d 953 ("In this case the trial court gave a cautionary *Long* instruction instead of permitting expert testimony regarding eyewitness identification."). Given the unique facts of this case, the controlling legal precedent, and the deferential standard of review, we affirm the trial court's ruling.

## II. Ineffective Assistance of Counsel

 ¶ 22 Clopten next argues his trial counsel was ineffective because counsel failed to obtain certain documents detailing an alleged sentence reduction Land obtained in exchange for his testimony implicating Clopten and because counsel failed to request a jury instruction of manslaughter. We are not convinced.

 ¶ 23 "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different." *State v. Cruz*, 2005 UT 45, ¶ 38, 122 P.3d 543 (internal quotation marks omitted). Moreover, Clopten must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (internal quotation marks omitted).

¶ 24 In this case, Clopten's trial counsel adequately cross-examined Land about his reduced sentence. During cross-examination, Land admitted that he had been facing federal charges that carried a potential life sentence and that he met with federal authorities to discuss testifying in this case. Land further acknowledged that, after "[he] agreed to testify against Deon Clopten," "when [he] got sentenced, [he] got eight years." [7] Moreover, Clopten's trial counsel read from the transcript of Land's interview with the federal authorities. The transcript demonstrated that Land was testifying against Clopten to obtain a reduced sentence in his federal case. In addition, Clopten's trial counsel reiterated during closing arguments that "Land is in the business of making deals to testify against other people" and that "by testifying in this case," Land's federal sentence was reduced.

¶ 25 Clopten's trial counsel effectively questioned Land's veracity. Although additional documents from the federal court may have provided further evidence of Land's motives, Land's testimony at trial, the transcript read into the record, and counsel's closing arguments convince us that Clopten's trial counsel was not ineffective and that the outcome of the trial would not have been any different with these documents. Accordingly, we affirm on this issue.

 ¶ 26 Likewise, we reject Clopten's argument that his counsel rendered ineffective assistance by failing to request a manslaughter instruction as a lesser included offense to murder.

> [W]hen a defendant requests a jury instruction on a lesser included offense, the evidence-based standard requires that the instruction be given when the trial court determines that (1) the lesser offense is "included" in the offense charged, and (2) there is evidence to justify acquittal of the greater offense and conviction of the lesser offense.

*State v. Kruger*, 2000 UT 60, ¶ 15, 6 P.3d 1116.

---

court "flip flopped" on the issue and therefore its final ruling demonstrates an abuse of discretion. We disagree. The trial court's final ruling was well-reasoned and does not exceed its allowed discretion. Moreover, we will not fault the trial court for reconsidering a difficult and important issue in an attempt to reach the most appropriate result.

7. Land had previously arranged a deal that would reduce the sentence to fifteen years. After he agreed to testify against Clopten, his sentence was further reduced to eight years.

¶ 27 Assuming manslaughter is a lesser included offense of murder, counsel was not ineffective for refusing to request an instruction in this case. Failure to raise a meritless legal argument does not constitute ineffective assistance of counsel. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶ 28 Here, there was no evidence to justify acquittal of the greater offense and conviction of the lesser offense. In Utah, "[c]riminal homicide constitutes manslaughter if the actor ... recklessly causes the death of another." Utah Code Ann. § 76–5–205 (2003). Conduct is reckless if the actor "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 76–2–103(3) (Supp.2007). On the other hand, "[c]riminal homicide constitutes murder if ... the actor intentionally or knowingly causes the death of another." *Id.* § 76–5–203(2)(a). Conduct is intentional when the conduct or result of such conduct "is [the actor's] conscious objective or desire." *Id.* § 76–2–103(1). Likewise, an actor engages in conduct knowingly "when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 76–2–103(2).

¶ 29 The evidence at trial indicated that the shooter saw the victim and announced, "I'm goin' to shoot him." The perpetrator then cocked the gun, "walked up on [the victim] close and, at point-blank range, he shot him [twice] in the back of the head" in "an execution type shooting." The shooting was "[v]ery quickly lethal." Indeed, Clopten concedes that "[t]he manner of [the victim's] death is not in dispute." Given these undisputed facts, there simply is no evidence to suggest that the shooter, whoever he was, did not act knowingly or intentionally when he marched up to the victim and shot him twice at point-blank range in the back of the head. Accordingly, any request for a manslaughter instruction would have been meritless under the circumstances. Counsel was not ineffective for refusing to make a futile request. *See Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546.

## CONCLUSION

¶ 30 Because the trial court did not err in excluding Dr. Dodd's testimony and because Clopten did not receive ineffective assistance of counsel, we affirm.

¶ 31 I CONCUR: PAMELA T. GREENWOOD, Presiding Judge.

THORNE, Judge (concurring):

¶ 32 I concur in the thoughtful analysis, as well as the result, of the majority opinion. However, I write separately to suggest that in light of the persuasive authorities cited by the majority in explaining the shortcomings of eyewitness testimony, the time has come to revisit the boundaries of trial court discretion in excluding expert testimony on the subject. Such a decision is not for this court to make, but I would urge the Utah Supreme Court to consider mandating the admission of such testimony in appropriate cases.

¶ 33 As explained in detail in *State v. Long*, 721 P.2d 483 (Utah 1986), eyewitness testimony is subject to the inexact vagaries of human perception and memory and inevitably leads to mistaken identifications in a substantial number of cases. *See id.* at 488–91. Not only are jurors largely unaware of the problems with eyewitness testimony, they may actually give it greater weight than other forms of evidence. I see little to lose and much to gain if criminal defendants are allowed to present expert testimony explaining how and why the eyewitness testimony in any particular case may be unreliable. This conclusion is only bolstered by the post-*Long* cases and articles cited by the majority. *See, e.g.*, Richard A. Wise et al., *A Tripartite Solution to Eyewitness Error*, 97 J.Crim. L. & Criminology 807, 823–42 (2007) (arguing for admission of expert testimony when the primary or sole evidence against the defendant is eyewitness testimony).

¶ 34 While a *Long* instruction is certainly better than nothing in terms of ameliorating the shortcomings of eyewitness testimony, it may not be as helpful to a jury as a live witness who can address the particular circumstances of any individual case. In appropriate cases, i.e., cases where the State's case rests substantially on eyewitness testimony,

an expert's individualized critique of the circumstances may be both relevant and helpful to the jury. *See* Utah R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *id.* R. 702(a) (stating that an expert may testify to specialized knowledge that "will assist the trier of fact to understand the evidence"). Further, because the expert can specifically address the impact of the particular facts of the case on the reliability of the eyewitness testimony, expert testimony should not be considered merely cumulative to a *Long* instruction. *Cf. id.* R. 403 (allowing exclusion of cumulative evidence); *State v. Hubbard,* 2002 UT 45, ¶ 17, 48 P.3d 953 ("[I]t is left to the trial court's sound discretion to decide *whether* the proffered expert testimony would constitute a lecture, the substance of which can be just as adequately conveyed to the jury through the judge in a jury instruction, as opposed to through expert testimony." (emphasis added)). Accordingly, it seems appropriate that such evidence should be admitted absent some good reason for the trial court to exercise its discretion and exclude it.

¶ 35 For the very reasons enunciated in the majority opinion, I urge the supreme court to revisit the issue of expert testimony in eyewitness cases. Nevertheless, the majority opinion faithfully implements the law as it currently stands, and under the current state of the law I concur in that opinion in all respects.