2002 UT 35

**STATE of Utah, Plaintiff and Appellee,**

v.

**Philip Earl HOLLEN, Defendant and Appellant.**

**No. 20000585.**

Supreme Court of Utah.

March 29, 2002.

Mark L. Shurtleff, Att'y Gen., Jeanne B. Inouye, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Kent R. Hart, Karen Stam, Salt Lake City, for defendant.

DURRANT, Justice.

¶ 1 Phillip Earl Hollen was convicted of two counts of aggravated robbery based on four eyewitness identifications. On appeal, Hollen claims that the trial court erred (1) in concluding that the eyewitness identifications were sufficiently reliable to be admitted at trial consistent with the Due Process Clause of the Utah Constitution, and (2) in not allowing a defense expert to give an opinion on the reliability of the process of identification. We affirm, concluding that (1) the eyewitness identifications in this case were at least as

reliable as an identification deemed constitutionally reliable in a prior case, and (2) the expert's opinion was excludable under Utah Rule of Evidence 702, since the expert's earlier testimony regarding the factors affecting the reliability of identifications, together with cautionary jury instructions, prepared the jury to draw its own conclusions about the reliability of the identifications without further assistance.

## BACKGROUND

### I. THE ROBBERY

¶ 2 Before business hours on the morning of July 16, 1995, two men with guns accosted Oscar Contreras, a lifeguard trainee, in the parking lot of Raging Waters, a water amusement park in Salt Lake City. One of the robbers ("disguised robber") was disguised with a baseball cap, a fake mustache, and wraparound sunglasses. The other robber ("second robber") was tall, slim, and blonde, and, like the disguised robber, wore red swimming trunks, a shirt, and sandals.

¶ 3 When Contreras informed the robbers that he did not know where the park kept its money, the disguised robber told Contreras to take them to the park manager. Contreras then escorted the robbers towards the park's administrative offices. Just outside the offices, they were met by Lou Livolsi, the park's general manager, and Channing Jones, the park's operations manager. The robbers asked Livolsi for money and flashed their guns. Livolsi explained that he would have to get the keys to the vault room.

¶ 4 At about this time, David Peterson, another park employee, walked by. Livolsi asked Peterson to go to the administrative offices and get the vault key from the finance officer, Jill Pittman. When Peterson and Pittman returned from the offices, the entire group proceeded to the vault room.

¶ 5 Inside the vault, the group met Janae Jones, another employee, who was counting money from the previous day. While Livolsi and Pittman filled two bags with money, the second robber tied the other victims' hands and duct-taped their mouths.

¶ 6 After Pittman and Livolsi finished filling the bags, they too were tied up. The two robbers then fled in Contreras's car. Shortly thereafter, the victims managed to free themselves and call the police.

### II. IDENTIFICATION OF HOLLEN AS THE DISGUISED ROBBER

¶ 7 Later on the day of the robbery, Contreras and Channing Jones helped Detective Ray Dalling make a composite drawing of the disguised robber. Livolsi and Pittman were shown the composite, and Livolsi later testified that it was "pretty accurate."

¶ 8 Approximately two months after the robbery, Channing Jones saw a television report of a robbery of a saloon. The news report showed Phillip Earl Hollen, who had been arrested for the robbery, being wheeled to an ambulance on a gurney. Channing Jones recognized Hollen as the disguised robber from the Raging Waters robbery, and informed Livolsi and Detective Dalling.

#### A. *Photo Array*

¶ 9 Detective Dalling then prepared a photo array that included a mug shot of Hollen that was a "few years old" and five additional photographs. Dalling later testified that he selected photos where "the age range, the shape of the chin, the shape of the head, the basic features of each one were similar," because he "didn't want Mr. Hollen to stand out from anyone else."

¶ 10 Dalling showed the array to Channing Jones on September 28, 1995, and Contreras on October 2, 1995. Before showing them the array, Dalling explained that (1) the disguised robber may or may not be in the array, (2) they need not identify anyone, (3) they could either spread the photos out or view them individually, and (4) facial features remain the same, but the amount of facial hair and hair styles may change.

¶ 11 Jones and Contreras selected Hollen's photograph from the array. Detective Dalling estimated that Jones took one to one-and-a-half minutes to make the identification, and Contreras two-and-a-half to three minutes. After Jones's identification of Hollen,

Dalling informed him that Hollen was in custody for another matter.[1]

## B. *Lineup*

¶ 12 On October 17, 1996, Hollen appeared in an in-person lineup along with five other persons. Pittman and Contreras identified Hollen as the disguised robber. Contreras noted on his identification form that he was "absolutely" certain. Livolsi was "pretty sure, but not definite" that Hollen was the disguised robber. Peterson selected Hollen and a filler,[2] but noted the latter "probably" was the disguised robber. Janae Jones selected the same filler as Peterson. Channing Jones did not attend the lineup.

## C. *Motion To Suppress*

¶ 13 Before trial, Hollen filed a motion to suppress the eyewitness identifications of him. The trial court conducted a hearing on the motion on February 19, 1998, just over two-and-a-half years after the robbery.

### 1. Contreras's Testimony

¶ 14 At the hearing, Contreras estimated that, during the course of the robbery, he had an opportunity to observe the robbers from a short distance for a total of ten minutes. Contreras recalled that the disguised robber wore a tank top. He admitted that the robbery "traumatized" him.

### 2. Channing Jones's Testimony

¶ 15 Jones testified that he focused on the robbers' faces from five feet away while waiting for Peterson to return with Pittman, and that he observed the disguised robber for a total of five minutes during the encounter. Jones recalled that the disguised robber wore a white t-shirt and the second robber wore a grey sweatshirt.

### 3. Livolsi's Testimony

¶ 16 Livolsi testified that he had an opportunity to observe the robbers while he conversed with them outside the administrative offices, while waiting for Peterson to return with Pittman, and again inside the vault room. Elaborating on his observations in the vault, Livolsi explained that he looked directly at the disguised robber when receiving instructions and periodically when emptying the vault. Livolsi estimated the group was in the vault for a total of five minutes. Regarding his qualified selection of Hollen at the lineup, Livolsi explained that he had chosen Hollen because he was "the closest choice." As to the disguised robber's clothing, Livolsi testified that he was eighty or ninety percent certain the disguised robber wore the sweatshirt.

### 4. Pittman's Testimony

¶ 17 Pittman testified that she glanced at the robbers for a few seconds outside the administrative offices, then three times while she filled the bags with money in the vault. She estimated that she observed the disguised robber for thirty seconds each time she looked at him in the vault. As to the disguised robber's clothing, Pittman recalled a tank top with possibly a t-shirt underneath.

### 5. The Expert's Testimony

¶ 18 Defense counsel called Dr. David Dodd to testify as an expert in the field of eyewitness identification. Dr. Dodd testified that fear, the use of a disguise, and the suggestibility of the identification procedure all may have interfered with the ability of the witnesses to accurately identify the assailants.

¶ 19 Regarding the suggestibility of the photo array, Dr. Dodd detailed an experiment he conducted with the same photo array used by Detective Dalling. In this experiment, Dr. Dodd instructed test subjects to select two persons from the array based on a description of the disguised robber from a police bulletin. The test subjects as a group selected only three of the six photos. Interpreting this result, Dr. Dodd opined that the photo array presented only three meaningful choices. He added that Jones's

---

**1.** Hollen claims that Detective Dalling also told Contreras that Hollen was in custody. Hollen's record citations do not support this claim. R.315:12, 17–18, 39.

**2.** A "filler" means a person in the lineup other than the suspect.

observations of Hollen on television in advance of his participation in the photo array, and the general desire of victims to apprehend assailants, compounded the suggestibility of the identification procedure. Accordingly, Dr. Dodd concluded that "there are some serious questions about the reliability" of the identifications in this case.

¶ 20 After hearing argument from the parties regarding the identifications, the trial court applied the reliability analysis set forth in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), and concluded that the identifications of Contreras, Channing Jones, Livolsi, and Pittman were sufficiently reliable to be admitted at trial.

### D. *Hollen's Trial*

¶ 21 At Hollen's trial in February 1998, the State introduced evidence of the photo array and lineup identifications. Contreras, Channing Jones, Livolsi, and Pittman also identified Hollen in court. The defense made continuing objections to the identifications based on its previous claim that the identification procedures were unreliable.

¶ 22 Following the eyewitnesses' testimony, the defense called Dr. Dodd to present expert testimony on the reliability of eyewitness identification. Dr. Dodd explained to the jury several factors that may affect the reliability of eyewitness identifications. He also applied these factors to particular facts of this case. In so doing, Dr. Dodd pointed out that the robber's disguise, Contreras's fear, and the composition of the photo spread all tended to undermine the reliability of the identifications.

¶ 23 The court did not, however, permit Dr. Dodd to give an opinion on the overall reliability of the process of identification:

DEFENSE COUNSEL: Based on all these factors and what you know about this case, Dr. Dodd, do you have an opinion as to whether the process of identification in this case raises serious questions as to [its] reliability?

THE STATE: [Objection.] I think these are matters the jury can decide.

THE COURT: Objection is sustained. This is within the province of the jury, Counsel.

¶ 24 At the close of evidence, the court gave the jury a cautionary instruction on eyewitness identifications based on *State v. Long*, 721 P.2d 483, 494 n. 8 (Utah 1986). The jury found Hollen guilty of two counts of aggravated robbery.

### ANALYSIS

¶ 25 On appeal, Hollen raises two claims related to the eyewitness identifications by Contreras, Livolsi, Channing Jones, and Pittman. Specifically, Hollen claims that (1) admission of the identifications violated his state due process rights because the identifications were unreliable, and (2) alternatively, the trial court abused its discretion in ruling that a defense expert could not opine at trial on the overall reliability of the process of identification in this case. We address each claim in turn.

### I. THE EYEWITNESS IDENTIFICATIONS WERE CONSTITUTIONALLY RELIABLE

¶ 26 The Due Process Clause of the Utah Constitution bars the admission of unreliable eyewitness identifications. *State v. Ramirez*, 817 P.2d 774, 779–80 (Utah 1991) (concluding that the standard for admissibility of eyewitness identifications under Article I, Section 7 of the Utah Constitution diverges from the standard under the federal Due Process Clause). The reliability of an eyewitness identification depends on the following five factors:

(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly.

*Id.* at 781 (internal quotation and citation omitted).

¶ 27 The trial court assessed these factors and concluded that the eyewitness identifications were sufficiently reliable to be admitted at Hollen's trial. Challenging this conclusion, Hollen claims that the eyewitness identifications were unreliable and thus their admission at trial violated his right to due process under the Utah Constitution.

### A. *Standard Of Review*

■ ¶ 28 In reviewing a trial court's decision to admit an eyewitness identification, "we defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision to admit and by reversing its factual findings only if they are against the clear weight of the evidence." *Id.* at 782. However, we review for correctness whether the "facts are sufficient to demonstrate reliability," since "this is a question of law." *Id.*

### B. *Analysis Of The Identifications Under Ramirez Factors*

¶ 29 In reviewing the trial court's analysis of the identifications, we consider each *Ramirez* factor in turn. Where Hollen challenges one of the trial court's pertinent factual findings, we review it for clear error. Then, to guide our assessment of whether the "facts are sufficient to demonstrate reliability," *id.*, we compare the identifications in this case to the identification in *Ramirez* that was deemed constitutionally reliable. *Id.* at 784. Finally, relying on our analysis of each *Ramirez* factor, we assess the overall reliability of the identifications.

1. Opportunity Of Witness To View The Actor During The Event

■ ¶ 30 Under this factor, "pertinent circumstances include the length of time the witness viewed the actor; the distance between the witness and the actor; whether the witness could view the actor's face; the lighting or lack of it; whether there were distracting noises or activity during the observation; and any other circumstances affecting the witness's opportunity to observe the actor." *Id.* at 782.

a. Length Of Time And Distance From Which Witness Viewed The Actor

¶ 31 Following the testimony of Contreras, Livolsi, Channing Jones, and Pittman at the pretrial suppression hearing, the trial court found that the "length of time of face to face or close contact observation [of the actor by the witnesses] ranged from one to three minutes to potentially up to ten minutes." Thus, the eyewitnesses in this case viewed the actor for a comparable or greater length of time and at a generally closer distance than the eyewitness in *Ramirez,* who claimed at various times to have viewed the actor for " 'a few seconds' or 'a second' to 'a minute' or longer," and whose testimony that he viewed the actor from ten feet conflicted with that of another witness who indicated the distance actually was up to thirty feet. *Id.*

b. Capability To View The Actor's Face

¶ 32 Although the trial court found that the "actor's face was clearly observed by each of the four witnesses," there is no dispute that the actor's disguise obscured certain details of his face. Specifically, the sunglasses covered the actor's eyes and part of the side of his face, and the fake mustache obscured his upper lip. On the other hand, the disguise did not prevent the witnesses from viewing other parts of the actor's face, such as his lower lip, nose, cheeks, and the lower portion of the forehead.

¶ 33 In *Ramirez,* a scarf "cover[ed] most of the actor's face." *Id.* at 776. As a result of this disguise, the eyewitness could observe only the actor's eyes, and only well enough to note that they were small. *Id.* at 782. Thus, the disguise in the instant case obscured less of the actor's face than the disguise in *Ramirez.*

c. Lighting

¶ 34 Additionally, the trial court noted that the witnesses viewed the disguised robber under the sunlight of a summer morning and under office lighting. The lighting conditions in *Ramirez* were less conducive to reliable observations: the observations occurred at nighttime in the parking lot of a fast food

restaurant. *Id.* at 776, 783 (noting that although witnesses generally described lighting as "good," "on occasion[ ] they described it as poor and stated that the gunman was in a shadowy area").

#### d. Distractions

¶ 35 Finally, in both this case and *Ramirez,* the presence of a second actor partially diverted the eyewitnesses' attention.

¶ 36 Overall, then, the relevant circumstances indicate that Contreras, Livolsi, Channing Jones, and Pittman had a better opportunity than the *Ramirez* witness to observe the actor at issue.

### 2. Degree Of Attention

¶ 37 We next turn to the second *Ramirez* factor, the eyewitnesses' degree of attention to the actor at the time of the event. *Id.* at 781. In the case now before us, the trial court found that the witnesses' "degree of attention, while somewhat varying, was concentrated on the identification of the two parties perpetrating the robbery, particularly after the weapon was shown and threatening comments were made, and up to and including the time when they were secured...."

¶ 38 Certainly, the presence of the second robber necessarily diverted some of the eyewitnesses' attention from the disguised robber. However, this diversion pales in comparison to the diversion created by the accomplice in *Ramirez,* who was swinging a pipe at the witness and threatening him during the witness's observations of the defendant. *Id.* at 783.

¶ 39 Overall, the eyewitnesses' degree of attention in this case exceeded that of the *Ramirez* witness.

### 3. Capacity To Observe

¶ 40 We next turn to the third *Ramirez* factor, the witnesses' capacity to observe. *Id.* "Here, relevant circumstances include whether the witness's capacity to observe was impaired by stress or fright at the time of the observation, by personal motivations, biases, or prejudices, by uncorrected visual defects, or by fatigue, injury, drugs, or alcohol." *Id.* at 783.

¶ 41 In this regard, the trial court concluded that the witnesses' capacity to observe was unimpaired. Specifically, although the trial court acknowledged that the witnesses experienced fear during the robbery, the court found that this did not interfere with their capacity to observe. In addition, the court found no evidence that the witnesses harbored any bias or prejudice against Hollen, or that fatigue or mind-altering substances affected their capacity to observe.

¶ 42 The circumstances in *Ramirez,* on the other hand, presented relatively greater concerns that fear, stress, or injury affected the witness's capacity to observe. In contrast to the situation here, where only a generalized threat of physical injury existed, the witness in *Ramirez* was physically assaulted with a pipe during a struggle with one of the assailants. *Ramirez,* 817 P.2d at 783. Furthermore, after this struggle, the witness overheard one of the assailants tell the other to shoot and kill the witness if he caused any more problems. *Id.* at 776, 783.

¶ 43 Thus, the circumstances indicate that Contreras, Livolsi, Channing Jones, and Pittman had a greater capacity to observe than the *Ramirez* witness.

### 4. Spontaneity, Consistency, And Suggestibility Of The Identification

¶ 44 Under the fourth *Ramirez* factor, "relevant circumstances include the length of time that passed between the witness's observation at the time of the event and the identification of defendant; the witness's mental capacity and state of mind at the time of the identification; the witness's exposure to opinions, descriptions, identifications, or other information from other sources; instances when the witness or other eyewitnesses to the event failed to identify defendant; instances when the witness or other eyewitnesses gave a description of the actor that is inconsistent with defendant; and the circumstances under which defendant was presented to the witness for identification." *Id.* at 783.

#### a. Length Of Time Between Observations And Identification

¶ 45 Approximately two months lapsed between the robbery and Channing Jones's and

Contreras's identifications of Hollen from the photo array; the lineup identifications occurred approximately one year and three months after the robbery.

¶ 46 In contrast, the *Ramirez* witness identified the actor "thirty minutes to an hour after the crime at a show up, so the elapsed time was [comparatively] minimal." *Id.* at 783.

### b. Mental Capacity and State of Mind At The Time Of Identification

¶ 47 Regarding this subfactor, the trial court concluded that "the mental capacity of the witnesses was impressive...." We further note that the witnesses had at least two months to recover from the stress of the robbery before their identifications.

¶ 48 In *Ramirez*, although we had some concerns that the witness might still be somewhat agitated when he identified the actor within an hour of the robbery, we found his state of mind did not otherwise influence his identification. *Id.* at 783.

### c. Exposure To Opinions, Descriptions, Identifications, Or Other Information

¶ 49 Regarding the possibility that outside influence tainted the witnesses' identifications, the trial court found that the "evidence tends to show there was not [sic] exposure to other opinions regarding the identification of the defendant at least until after the lineup."

¶ 50 In challenging this factual finding, Hollen first points out that Livolsi and Pittman saw the composite that Channing Jones and Contreras helped prepare the day of the robbery. Hollen claims, in effect, that Livolsi's and Pittman's later identifications of Hollen were unconsciously based on their exposure to the composite rather than their own independent recollection of the disguised robber. Hollen's claim is not supported by the clear weight of the evidence, however. To the contrary, the evidence shows Livolsi and Pittman had an opportunity to observe the disguised robber on the day of the robbery. In addition, the court noted that the witnesses themselves had indicated that their identifications were not based on outside influence. Thus, the trial court did not clearly err in discounting the significance of the witnesses' exposure to the composite.

¶ 51 Hollen also points out that Channing Jones told Livolsi about seeing the "disguised man," whom Jones later identified as Hollen, on television. However, we see little evidence that Livolsi based his subsequent identification on this conversation. Indeed, Hollen does not claim that Livolsi ever saw the television report or otherwise gained insights about Hollen's appearance from his conversations with Channing Jones. At most, Jones's assertions may have caused Livolsi to expect that the lineup would include the disguised robber, but this possibility seems rather remote given that the lineup occurred one year after the television report.

¶ 52 Thus, the circumstances in this case are similar to the situation in *Ramirez*, where there also was little concern that the eyewitness identification was derivative of another witness's identification: in *Ramirez*, at the time of the identification, the witness knew only that police believed that the defendant matched the description of the suspect, and that another victim had not identified the suspect as one of the assailants. *Id.* at 783.

### d. Instances When Witness Or Other Eyewitnesses Failed to Identify Defendant

¶ 53 This subfactor clearly favors the eyewitness identifications in this case. The trial court found "the consistency with which the[] witnesses have identified" Hollen as the masked robber to be "quite remarkable." Indeed, Contreras identified Hollen from the photo array, at the in-person lineup, and at trial; Livolsi and Pittman identified Hollen at the in-person lineup and at trial; and Channing Jones identified Hollen when he saw him on television, from the photo array, and at trial. Peterson and Janae Jones, for their part, picked both Hollen and another person at the lineup, although both opined the other person was the assailant. Thus, four of the six witnesses to the robbery consistently identified Hollen as the disguised robber.

¶ 54 In contrast, only one of the three eyewitnesses in *Ramirez* was able to identify the defendant. *Id.* at 783.

### e. Consistency Of Witness Descriptions

¶ 55 We next consider the consistency of the witnesses' descriptions of the disguised robber. Although the trial court made no specific findings in this regard, the record reveals some variation in the witnesses' descriptions of the disguised robber. For example, in contrast to the other witnesses, Pittman did not describe the disguised robber as wearing sunglasses. Moreover, unlike the other witnesses—who described the disguised robber as wearing a white t-shirt or tank top, and his accomplice as wearing a sweatshirt—Livolsi remembered the disguised robber as wearing the sweatshirt.

¶ 56 In *Ramirez,* the "descriptions [were also] somewhat confused." *Id.* For example, at a suppression hearing, the *Ramirez* witness initially stated positively that the actor wore no hat. This assertion conflicted with (1) another eyewitness's recollection that the actor wore a baseball cap, (2) the witness's later testimony at trial that he was unsure as to whether the actor wore a hat, (3) and the fact that the *Ramirez* defendant was wearing a baseball cap when taken into custody shortly after the robbery. *Id.* at 784. The inconsistencies regarding the hat were troubling because the witness "claimed to have identified [the defendant] principally by his eyes, . . . [and a hat] would seem to affect a witness's view of the gunman's eyes." *Id.*

¶ 57 In contrast, the inconsistencies regarding the sunglasses and clothing in this case seem less consequential. Indeed, although Pittman did not describe the actor as wearing sunglasses, she did not claim to have identified Hollen based on his eyes. Similarly, Livolsi, who differed with the other witnesses regarding the actor's clothing, did not claim to have relied on what Hollen was wearing at the lineup in identifying him.

### f. Suggestibility Of Circumstances Under Which Defendant Was Presented To The Witness For Identification

¶ 58 Concerning the suggestibility of the identification process, the trial court found that the photo array depicted six individuals "with similar characteristics." Hollen disputes this conclusion, noting that Dr. Dodd opined that only three of the pictures matched the description of the disguised robber. However, Detective Dalling testified that to ensure Hollen did not "stand out from anyone else," he had selected photographs where "the age range, the shape of the chin, the shape of the head, the basic features of each one were similar." Under the circumstances, we conclude that the trial court did not clearly err when, after examining the photographs for itself, it resolved these conflicting opinions in the State's favor. We also note that Dalling told Contreras and Channing Jones, the two witnesses who participated in the photo array identification procedure, that the array may or may not include the disguised robber. Such a precaution further reduces concerns over suggestibility.

¶ 59 Significantly, even if we were to accept Dr. Dodd's opinion that the array presented only three meaningful choices, this case would still compare favorably to *Ramirez,* where the witness identified the defendant at a "blatant[ly] suggestive[ ]" show up:

> The identification took place on the street in the middle of the night. Ramirez, with dark complexion and long hair, was the only person at the show up who was not a police officer. He stood with his hands cuffed to a chain link fence behind his back. The headlights of several police cars were trained on him. The witnesses viewed him from the back seat of a police car. And while the remarks of the police officers prior to the show up were to the effect that they had apprehended someone who fit the description of one of the robbers may not of themselves be unnecessarily suggestive, they must be considered as part of the circumstances surrounding the identification.

*Id.*

### 5. Nature Of The Event

¶ 60 The final *Ramirez* factor, whether the nature of the event was such that the "witness would perceive, remember, and relate it correctly," includes such considerations "as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race

of the actor was the same as the observer's."
*Id.* at 781.

¶ 61 Regarding this factor, the trial court concluded that "the nature of the event tended to focus the attention of the witnesses on what was occurring." Although not specifically mentioned by the trial court, we note that Contreras and Livolsi, like the *Ramirez* witness, were aware from the outset that a robbery was taking place, *id.;* Channing Jones and Pittman apparently did not initially recognize the situation as a robbery, however, which may have caused them to initially pay relatively less attention to the robbers.

¶ 62 Regarding the second consideration included under this factor, neither party in this case alleges that racial similarity enhanced the reliability of the identifications or that racial differences detracted from the reliability. In *Ramirez,* we discounted the racial difference between the witness and actor in *Ramirez* because the identification was not based on features where this difference was a factor. *Id.*

¶ 63 Thus, in terms of this factor, the identifications of Contreras and Livolsi were comparable to that of the *Ramirez* witness, while those of Channing Jones and Pittman were perhaps slightly inferior.

### C.   *Overall Reliability Assessment*

¶ 64 "Considering the facts in the light most favorable to the trial court's decision [to admit the eyewitness testimony] and giving due deference to the trial judge's ability to appraise demeanor evidence," *id.* at 784, we conclude that the identifications were constitutionally reliable and therefore admissible. Regarding demeanor evidence, we note that the trial court found all the witnesses "to be credible persons." In addition, many of the circumstances bearing on reliability—lighting, viewing distance, consistency among the witnesses, and suggestibility of the identification procedure—compare very favorably to the eyewitness testimony deemed constitutionally reliable in *Ramirez.* Although considerably more time passed between the robberies and identifications in this case than in *Ramirez,* the passage of time was not so long as to force the conclusion that the identifications should not have

been admitted into evidence. Overall, the factors bearing on reliability clearly indicate that the identifications in this case were at least as reliable as the identification in *Ramirez.* Accordingly, we conclude that admission of the eyewitness identifications into evidence did not violate Hollen's right to due process under Article I, Section 7 of the Utah Constitution.

### II.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING THE EXPERT'S OPINION ON THE RELIABILITY OF THE PROCESS OF IDENTIFICATION

¶ 65 Hollen next claims that the trial court abused its discretion in precluding his expert from opining as to whether the process of identification in the case raised serious questions about the reliability of the eyewitness identifications. We disagree.

### A.   *Standard Of Review*

¶ 66 "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability." *State v. Larsen,* 865 P.2d 1355, 1361 (Utah 1993) (citations omitted).

### B.   *The Expert's Testimony On The Factors Affecting The Reliability Of Eyewitness Identifications, Together With The Cautionary Jury Instruction, Enabled The Jury To Form This Opinion Themselves*

¶ 67 The trial court's decision to exclude the expert's opinion did not exceed the limits of reasonability. In reaching this conclusion, we first place the trial court's decision in its proper context. Before Hollen's attorney tried to solicit the expert's opinion as to the overall reliability of the process of identification, the expert not only gave extensive testimony on factors that affect the reliability of identifications, he also applied the

factors to this case, as Hollen himself points out in his brief:

> Dr. Dodd noted several factors that limited the witnesses' capacity to accurately identify the assailants, including the fact that they had only seen the robbers on one occasion. He also concluded that the elaborate disguise had an "enormous influence" on the witnesses' ability to acquire memory of the disguised man's ... face because they could not see the entire facial pattern together.
>
> Dr. Dodd continued that whenever a gun is displayed people tend to spend a significant amount of time focusing on the weapon [and that] [f]ear also impairs witnesses' ability to acquire memory. Dr. Dodd expressed particular concern that Oscar [Contreras] showed a high degree of fear.
>
> Dr. Dodd explained that research has established that to accurately commit a person to memory, a witness must spend time actually examining the other person's face rather than simply spending time in a person's presence.... He added that studies of actual crimes show that victims "have a very difficult time remembering and identifying the face of the person they saw commit the crime."

Appellant Brief at 19 (record citations omitted). Dr. Dodd also testified, inter alia, (1) on the negative impact of the passage of time and composite sketches on identifications; and (2) that, in his opinion, the photo array in this case was suggestive.

¶ 68 Only after this extensive testimony did the trial court prevent the expert from opining as to the overall reliability of the process of identification. In addition, following this limited exclusion, the trial court permitted defense counsel to solicit Dr. Dodd's opinion as to which factors caused him particular concern in terms of reliability, such as the use of a disguise. Then, at the close of evidence, the trial court read a lengthy jury instruction concerning the reliability of eyewitness identifications as set forth in *State v. Long*, 721 P.2d 483, 494 n. 8 (Utah 1986).

¶ 69 Placed in its proper context, the trial court's exclusion of the expert's opinion clearly fell within the court's wide discretion under the rules of evidence. Indeed, Utah Rule of Evidence 702 conditions the admissibility of an expert's testimony or opinion on it assisting the trier of fact:

> If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Utah R. Evid. 702 (emphasis added); *Larsen*, 865 P.2d at 1361 (interpreting rule 702 as requiring that the expert's testimony be " 'helpful to the finder of fact.' " (quoting *State v. Rimmasch*, 775 P.2d 388, 398 n. 8 (Utah 1989))).

¶ 70 The expert's opinion did not meet this condition, however.[3] When Hollen's attorney tried to solicit the expert's opinion, the expert had already educated the jury on factors that impact the reliability of eyewitness identifications. Armed with this knowledge, the jury could form a conclusion regarding the overall reliability of the identifications without further assistance. The trial court's cautionary jury instruction further prepared the jury to draw its own informed conclusion. In addition, in addressing the individual factors affecting eyewitness testimony, the expert had on direct examination focused on the defects in the identification process, so the jury could readily anticipate the expert's overall conclusion.

¶ 71 Accordingly, we conclude the trial court did not exceed its discretion when it excluded the expert's opinion on the overall reliability of the process of identification.

## CONCLUSION

¶ 72 The factors bearing on the reliability of eyewitness identifications indicate that the identifications were sufficiently reliable to

---

**3.** In objecting to the defense counsel's question to the expert as to whether he had an opinion as to the reliability of the process of identification in this case, the prosecution argued "these are matters the jury can decide." Thus, although the prosecution did not specifically mention rule 702, the prosecution's objection indicated that the expert's opinion would not be helpful to the jury, and the trial judge's sustainment of the objection indicates the judge agreed.

have been admitted into evidence consistent with the Due Process Clause of the Utah Constitution. In addition, the trial court did not abuse its discretion when, after permitting a defense expert to testify on factors bearing on the reliability of the identifications, it did not permit the expert to give his overall opinion on whether the process of identification in this case raised serious questions as to the reliability of the eyewitness testimony. Accordingly, we affirm the trial court's rulings and Hollen's convictions.

¶ 73 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS, concur in Justice DURRANT'S opinion.