2018 UT App 9

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARK JESS ROBERTS,
Appellant.

Opinion
No. 20150247-CA
Filed January 11, 2018

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
The Honorable Deno G. Himonas
No. 101908693

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

POHLMAN, Judge:

¶1     Mark Jess Roberts appeals his convictions for various
crimes involving sexual abuse of a child (Victim). He argues that
the trial court erred by (1) admitting into evidence a video-taped
interview of Victim by the Children's Justice Center (the CJC
interview), (2) failing to strike testimony of a witness, and (3)
excluding evidence regarding another potential perpetrator of
Victim's sexual abuse. We affirm.

## BACKGROUND

¶2     Between the ages of four and five, Victim lived with her
mother and Roberts, her mother's boyfriend. Though she knew

that Roberts was not her biological father, she referred to him as "dad."

¶3 Victim was taken to live with her grandmother (Grandmother) when she was five years old and eventually disclosed to Grandmother, her cousin, and a therapist that Roberts had sexually abused her. In May 2010, Grandmother took Victim to the Children's Justice Center where a caseworker interviewed Victim about the abuse. The CJC interview was videotaped, and during the interview, Victim disclosed details of several separate incidents of abuse.

¶4 The State charged Roberts with three counts of first degree felony rape of a child, two counts of first degree felony sodomy on a child, one count of first degree felony aggravated sexual abuse of a child, and one count of class A misdemeanor lewdness involving a child.[1]

¶5 Before and during trial, the court made several evidentiary rulings relevant to this appeal. First, before trial, the State moved to admit the video of the CJC interview. Roberts objected under rule 15.5 of the Utah Rules of Criminal Procedure, arguing that the interview was not sufficiently reliable. The court held a hearing on the matter, and both parties presented expert testimony addressing the reliability of the interview. The court ultimately found the CJC interview to be sufficiently reliable and allowed the State to play the video for the jury.

¶6 At trial, Victim's therapist, a social worker (Social Worker), testified. She provided specific details about Victim and their therapy sessions, and she also compared Victim's behavior to other child victims of sexual abuse. Approximately thirty minutes into the State's direct examination Roberts

---

1. Roberts also faced other charges, but those were ultimately resolved in his favor and are not the subject of this appeal.

objected, arguing that the State had not notified him that Social Worker would testify as an expert and moving to strike Social Worker's testimony in its entirety. The trial court ruled that Roberts's motion was untimely and that he had therefore waived his objection.

¶7    Finally, Roberts attempted to elicit testimony from Grandmother that her ex-husband, Victim's grandfather (Grandfather), was a registered sex offender and had previously been convicted of child sexual abuse. The State objected, arguing under rule 403 of the Utah Rules of Evidence that evidence of Grandfather's previous convictions was substantially more prejudicial than probative. The court sustained the objection, concluding that the danger of unfair prejudice substantially outweighed the probative value of the evidence.

¶8    The jury convicted Roberts on all counts. Roberts appeals.

ISSUES

¶9    Roberts raises three main issues on appeal. First, he argues that the trial court erred in admitting the CJC interview. Second, he argues that the court abused its discretion when it did not strike Social Worker's testimony. Finally, he argues that the court abused its discretion by not admitting evidence of Grandfather's prior convictions.

ANALYSIS

I. The CJC Interview's Admissibility

¶10    Roberts argues that the trial court erred in admitting the CJC interview into evidence. He contends that Victim's recorded statement was not sufficiently reliable as required by rule 15.5 of the Utah Rules of Criminal Procedure.

¶11   Rule 15.5 provides that "the oral statement of a victim . . . younger than 14 years of age which was recorded prior to the filing of an information or indictment is . . . admissible as evidence in any court proceeding regarding the offense if," among other things, "the court views the recording before it is shown to the jury and determines that it is sufficiently reliable and trustworthy and that the interest of justice will best be served by admission of the statement into evidence." Utah R. Crim. P. 15.5(a)(8).

¶12   Reliability in this context is a fact-intensive inquiry, requiring the trial court to undertake "an in-depth evaluation of the proposed testimony" and then enter findings and conclusions to explain its decision to admit or exclude the testimony. *See State v. Snyder*, 932 P.2d 120, 133 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). As a result, "[i]n reviewing the trial court's decision to admit, we defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision to admit and by reversing its factual findings only if they are against the clear weight of the evidence." *See State v. Ramirez*, 817 P.2d 774, 782 (Utah 1991); *see also* Utah R. Civ. P. 52(a)(4) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses."). "However, we review for correctness whether the facts are sufficient to demonstrate reliability, since this is a question of law." *See State v. Hollen*, 2002 UT 35, ¶ 28, 44 P.3d 794 (citation and internal quotation marks omitted); *see also State v. Cruz*, 2016 UT App 234, ¶ 16, 387 P.3d 618 ("Whether the trial court correctly admitted the videotaped interviews into evidence pursuant to rule 15.5 is a question of law that we review for correctness.").

¶13   In making its reliability determination, the trial court considered numerous factors and made extensive findings. Among other things, the court found that the interview showed Victim to be "a six-year-old that was articulate, aware of the

circumstances under which she was being interview[ed], and . . . strong enough personality-wise and intelligent to understand the questions and respond appropriately if she so desired." The court also made findings regarding the timing of the interview, the spontaneity of Victim's statements, the types of questions asked, and whether Victim's statements seemed rehearsed. The court found that, overall, the allegations described "were sufficiently consistent," as Victim "told the same or similar story throughout the interview"; that Victim's statements contained "sufficient detail or description" given her age; and that she "volunteered information, often spontaneously."

¶14    Despite the court's findings, Roberts asserts that the court's reliability determination must be reversed for several reasons. He challenges the interviewing technique and the court's assessment of it. He also challenges the court's determinations about the length of time that elapsed between the abuse and the interview and the court's assessment of allegedly incredible statements made by Victim. We address each set of challenges below.

A.    Interviewing Technique

¶15    Roberts asserts that the forensic interviewing technique was flawed in a way that rendered the CJC interview unreliable. In particular, he contends that the interviewer used leading questions; that she did not elicit a promise from Victim to tell the truth and did not establish what truth was; that the interviewer's reliance on drawings was improper; and that the interviewer failed to ask follow-up questions about certain key issues, such as conversations Victim had with Grandmother and Victim's cousin about the abuse. He also contends that, regardless of the quality of Victim's responses, the "forensic interviewing tactics were flawed" and that "[o]nly a reliably conducted forensic interview is an acceptable substitute for effective cross examination." We disagree.

¶16    The court, after considering expert testimony on the issue, rejected Roberts's contention that the interviewer's technique

undermined the reliability of Victim's interview. For example, the court found that Victim "did not appear to be subject to any leading questions." The court further noted that, even if certain questions could be properly characterized as leading, the experts agreed those questions "were insignificant to the interview" and that Victim's responses allayed concerns about potentially problematic inquiries.

¶17 Regarding the promise of truth, the court found that, although Victim was not asked at the outset to "promise to tell the truth," "the content of the interview, the answers given, the responses to the questions, [and Victim's] ability to correct and say 'no' or 'I don't know' . . . demonstrate[d] [Victim] did understand, at the level of a six-year-old, what it means to tell the truth."

¶18 As to the use of drawings during the interview, the court noted that one of the experts opined that the manner in which the drawings were used was proper; that it was Victim who suggested using the drawings, "probably because she was a six-year-old embarrassed to discuss or talk about the events that she described"; and that the interviewer had Victim explain what she had drawn.

¶19 Finally, with regard to a lack of follow-up questions, the court determined that, given Victim's responses to the questions posed to her, the interviewer's failure to "pursu[e] certain additional details" did not render the interview unreliable and that "any lack of thoroughness . . . goes to the weight to be given to the evidence of the interview."

¶20 The court also generally found that, although the interview was not perfect, the quality of Victim's responses allayed concerns about any potentially deleterious effect from the interviewing technique employed. For example, the court found that, overall, the allegations described "were sufficiently consistent," as Victim "told the same or similar story throughout the interview." The court also found that Victim's statements contained "sufficient detail or description" given her age; that

she "volunteered information, often spontaneously"; and that she "elaborated" and "gave information she thought was relevant to the questions posed to her." In addition, the court found that Victim's responses and descriptions "did not appear to be rehearsed," that there was "no evidence in the interview that she was being coached or that she was being [led] by the interviewer," and that she "did not appear to be under pressure to tell a certain story."

¶21  Roberts fails to demonstrate that the trial court's findings are clearly erroneous or that the trial court erred in determining that the interview was sufficiently reliable in light of those findings. Rather, he primarily takes issue with the court's emphasis on the quality of Victim's responses rather than the flaws he asserts are evident in the interviewing technique. In doing so, he appears to also suggest that the court ought to have assessed and credited the expert testimony about the interview differently. But Roberts has directed us to no authority suggesting that there is one "right" way to conduct an interview and that any departure from that way will render the interview unreliable. Rather, to make its reliability determination, the court was required to assess the interview in all of its circumstances, with any assistance from the experts' opinions the court chose to credit. That the court chose to weigh more heavily Victim's responses than a perceived flaw in the interviewing technique does not, without more, render its reliability determination erroneous. And, more to the point, we will defer to the court's determination that certain alleged flaws, such as the failure to ask certain follow-up questions or elicit an express promise to tell the truth, did not outweigh the factors demonstrating the interview's overall reliability. *See Salt Lake City v. Reyes-Gutierrez*, 2017 UT App 161, ¶ 22, 405 P.3d 781 ("Our role is not to reweigh the evidence, but to determine only if the appellant has demonstrated a lack of evidentiary support for the trial court's findings. The mere fact that this court might have reached a different result on the evidence presented does not justify setting aside the trial court's findings." (citations and internal quotation marks omitted)); *State v. Hodges*, 798 P.2d 270, 274 (Utah Ct. App.

1990) (stating that where "the judge serves as fact finder, the court has considerable discretion to assign relative weight to the evidence before it," which "includes the right to minimize or even disregard certain evidence").

B.      Other Determinations

¶22    Roberts also challenges other of the trial court's determinations—specifically, the court's determinations as to the timing of the interview relative to the abuse, and its assessment of certain of Victim's statements that he claims "strain credulity." We address each below.

1.      Timing

¶23    First, Roberts challenges the trial court's findings as to whether the length of time between the abuse and the CJC interview undermined the reliability of Victim's statement. The court found that more than one year elapsed between the abuse and the interview but that the timing did "not appear to have affected . . . the reliability of the interview." It also found that the length of time was "not an unusually long period . . . given the type of allegations" and given the fact that the abuser was "someone who [Victim] viewed as a father-figure."

¶24    Nevertheless, relying on *State v. Nguyen*, 2012 UT 80, 293 P.3d 236, Roberts contends that the general proposition that "'a video-recorded interview of a child might be more reliable than in-court testimony in cases of . . . child sexual abuse because it is made closer in time to the incident'" is "less compelling in this case," due to the length of time involved. (Quoting *id.* ¶ 21.) And relying on both *Nguyen* and *State v. Lenaburg*, 781 P.2d 432 (Utah 1989), in which the interviews at issue took place substantially closer in time to the alleged abuse, he apparently argues that, regardless of the other circumstances surrounding the interview, the length of the delay between the abuse and the interview in this case rendered the interview incapable of being "better evidence than in-court testimony." But neither *Nguyen* nor *Lenaburg* established a bright-line rule that CJC interviews

conducted more than one year from the time of the alleged abuse are per se unreliable. *See Nguyen*, 2012 UT 80, ¶ 21; *Lenaburg*, 781 P.2d at 436.

¶25 We also reject Roberts's argument that, because the interview was conducted more than one year after the abuse, the details were "not fresh in the child's mind" so that the video was unlikely to provide "better evidence than in-court testimony." Here, Victim was interviewed approximately one year after the abuse; in contrast, Victim testified at trial five years after the abuse.[2] Because the interview was significantly closer in time to the abuse, it would likely be more detailed and perhaps more accurate than the testimony given at trial. *See Nguyen*, 2012 UT 80, ¶ 21 ("[A] video-recorded interview of a child might be more reliable than in-court testimony in cases of child abuse or child sexual abuse because it is made closer in time to the incident and is removed from the stressful setting of a trial."). Accordingly, Roberts has failed to show error in the court's assessment of the timing in the case.

2.      Incredible Statements

¶26 Next, Roberts contends that the CJC interview was unreliable due to certain incredible statements made by Victim. He again cites *Lenaburg*, where the Utah Supreme Court determined that a child's recorded testimony was unreliable in part because of the child's fantastical statements. 781 P.2d at 436 (concluding that the child victim's statement could not be viewed as reliable where the child stated, among other things, that during the alleged abuse the defendant had a "monster

---

2. The State filed the initial information six months after the CJC interview, and it took another three-and-one-half years for the case to go to trial. During that time period, the State thrice amended the information, Roberts sought and received several continuances, and the court heard and resolved a number of significant pretrial motions.

hand," that the defendant shot himself and that when he was "'just about to die, . . . along came fat Jenny,'" and that defendant then died and "'turned back into mommy'" but "'still sleeps with a gun'"). Roberts then points to certain of Victim's statements, apparently alleging that they are similarly fantastical and therefore unreliable. For example, he points to Victim's statements that Roberts "'took some scissors and ripped [her] clothes,'" that Roberts "had her 'touch his wiener' for 'twenty days with' 'a backscratcher or something,'" and that "[the abuse] happened on a bed with 'like one hundred pillows.'"

¶27  But in making these assertions, Roberts fails to address the court's findings on this issue. The court recognized that, although an adult might not describe details in the way Victim did, her statements and descriptions were those "of a six-year-old" and that they were "consistent" and "appropriate" responses for a six-year-old child. Thus, a six-year-old child's reference to "like a hundred pillows" is a way to describe a large number of pillows in relative terms, not a carefully calculated estimate of the literal number of pillows on hand. The court also determined that, overall, Victim was "sufficiently consistent in her statements about what she explained occurred" and that "[a]ny discrepancies in her statements are things that go to the issue of weight of the evidence which will be left to the Jury." Having failed to identify an error in the trial court's findings, Roberts has therefore failed to demonstrate that the court did not appropriately address and resolve any concerns over potential incredility in the statements identified.[3]

---

3. Roberts also briefly challenges the court's reliance on Victim's familiarity with him, contending that the court did not "explain why the identity of the defendant made the allegation more reliable" and asserting that it "cannot be enough that the child identified the defendant and the defendant had a close relationship with the child." But contrary to Roberts's suggestion, the court did not base its reliability determination

(continued…)

¶28    In sum, we conclude that the trial court's findings support its ultimate determination that, notwithstanding Roberts's arguments to the contrary, the CJC interview was reliable under rule 15.5 of the Utah Rules of Criminal Procedure. We therefore affirm the court's admission of the CJC interview.

II. Roberts's Motion to Strike Social Worker's Testimony

¶29    Roberts next argues that the trial court erred when it concluded that Roberts waived his objection to Social Worker's testimony because the objection was untimely and, on that basis, denied his motion to strike. We review this decision for an abuse of discretion. *See State v. Bredehoft*, 966 P.2d 285, 290 (Utah Ct. App. 1998). Alternatively, Roberts argues that if we conclude that he waived his objection, his trial counsel performed ineffectively by failing to timely object. After describing the relevant proceedings at trial, we address each contention below.

A.    Trial Proceedings

¶30    During trial, the State called Social Worker, with whom Victim had undergone therapy following the abuse, to testify. Over the course of approximately thirty minutes of direct examination, the State asked Social Worker both factual and general questions related to her treatment of Victim. In particular, the State asked Social Worker specific factual questions about Victim's use of pictures during their sessions, Victim's use of a "support person" in therapy, and Victim's specific behaviors that Social Worker was treating. Interspersed among those factual questions were more general questions not specific to Victim. For example, the State asked Social Worker to

_____

(…continued)

solely on the nature of Victim's relationship to Roberts. And Roberts fails to suggest a legal basis from which we may discount the weight the court afforded this factor in its overall reliability analysis.

describe "the process of disclosure" in child sexual abuse situations, to explain why children might use drawings to "tell their story," and to opine on whether the types of behaviors Victim exhibited were "consistent with sexual abuse." All of these questions were asked and answered without objection.

¶31   Near the end of its direct examination, the State asked Social Worker to explain "the process of memory and forgetting" and why a child may not remember certain details related to traumatic events. Roberts objected, arguing that "expertise [had not] been established with respect to [Social Worker's] ability to talk about memory." The court sustained the objection. The State attempted to establish foundation by eliciting information about Social Worker's education, experience, and background related to "children's memory and the process of memory fade."

¶32   In response, Roberts asked to conduct voir dire of Social Worker on the issue of memory outside the presence of the jury. At the conclusion of the voir dire, Roberts argued to the court that the issue before the court was actually "twofold": in addition to the memory issue, he could not recall seeing a notice of expert witness with respect to Social Worker. The court asked the State if it had provided "appropriate notice," and the State conceded it had not. Roberts then requested that "all [of Social Worker's] testimony be stricken, all of it[,] . . . because she's been asked a number of times to give expert opinions about this and that" and that, while "there were things that she talked about that were factual in nature," "for the last 15 of 20 minutes what we've heard about is what's [her] opinion about how kids behave under these circumstances."

¶33   The State responded by arguing that Roberts's objection was untimely. The court agreed, stating that, with the exception of the objection on the memory issue, the objection to Social Worker's testimony as a whole and the expert opinions was "waived when [it wasn't] timely made." The court observed that Social Worker had talked about "many" factual things and that, as to timing, "it's one thing if there's a question that goes by"

and is revisited "in a few minutes." However, in this case, "too much time" had gone by with respect to Roberts's overall objection, and the court determined that it would not, after "20 minutes or a half hour, go back and, if appropriate, tell the jury to just forget that." On the memory issue, however, the court ruled that it was "too much of a separate area" from the area of expertise of a licensed clinical social worker. Accordingly, the court sustained the objection with respect to the memory issue but it overruled the objection as to the remainder of Social Worker's testimony and denied Roberts's motion to strike it.

### B. Roberts's Arguments on Appeal

### 1. Waiver of the Objection

¶34 Roberts first argues that the court abused its discretion in determining that he waived his objection to Social Worker's testimony and denying his motion to strike on that basis. We disagree.

¶35 To begin with, it is axiomatic that objections to evidence must be timely made. *See* Utah R. Evid. 103(a) (providing that to preserve a claim of error regarding the admission of evidence, the party must, among other things, "timely object[]"); *State v. Johnson*, 2017 UT 76, ¶ 16 n.4 (explaining that an issue may be waived in the trial court if it is not raised "at the required time"); *State v. Emmett*, 839 P.2d 781, 783–84 (Utah 1992) ("[O]ur case law establishes that the doctrine of waiver has application if defendants fail to raise claims at the appropriate time at the trial level, so the trial judge has an opportunity to rule on the issue . . . ."). The need for a timely objection seems particularly relevant in circumstances such as those present here, where twenty to thirty minutes of testimony in front of a jury had elapsed before Roberts's counsel objected, and where the potentially objectionable expert testimony was interspersed with non-objectionable factual testimony. We think it unlikely that the court exceeded its discretion in concluding that it could not reasonably review twenty to thirty minutes of testimony and

selectively tell the jury to disregard the offending portions while considering the non-offensive ones, and then outline for the jury which was which. *See State v. Velasquez*, 672 P.2d 1254, 1265 (Utah 1983) (holding that a later "motion to strike was not an adequate substitute for an objection" in the case at hand "because of the close intermingling of the admissible with the inadmissible evidence" at issue).

¶36   But we need not resolve whether the court exceeded its discretion in concluding that Roberts waived his objection to the admission of Social Worker's testimony, because we are able to sustain the court's ruling on another ground—one that was recognized by Roberts in his motion for a new trial and that the State has briefed as an alternate ground for affirmance on appeal. *See State v. Butterfield*, 2001 UT 59, ¶ 31, 27 P.3d 1133 ("[A]n appellate court may sustain a trial court's evidentiary ruling on any available ground . . . ." (citation and internal quotation marks omitted)). In his motion for a new trial, Roberts argued that Social Worker's testimony should have been stricken because the State failed to provide notice as required under Utah Code section 77-17-13, which provides the notice requirements for expert testimony in a criminal case. Roberts recognized that a continuance was the "mandatory" remedy for a violation of this section, but he instead requested, for strategic reasons, exclusion of Social Worker's entire testimony. The State argues on appeal that we may affirm because excluding Social Worker's testimony was not a remedy available to Roberts under Utah Code section 77-17-13. We agree.

¶37   "The expert witness notification statute," Utah Code section 77-17-13, "provides that in a felony case, a party intending to have an expert testify must give the opposing party notice as soon as practicable but not less than 30 days before trial." *State v. Bredehoft*, 966 P.2d 285, 294 (Utah Ct. App. 1998) (citation and internal quotation marks omitted). Section 77-17-13 also sets out the content requirements of the notice and, as relevant here, the remedies available for a party's failure to provide expert notice to the opposing party in a criminal case.

*See* Utah Code Ann. § 77-17-13 (LexisNexis 2012). And, as the State points out, the section provides that excluding the expert's testimony is a remedy only if the offending party deliberately violates the notice requirements outlined in the section. *See id.* § 77-17-13(4). Specifically, subsection (4) provides, with our emphasis,

> (a) If the defendant or the prosecution fails to substantially comply with the requirements of this section, the opposing party shall, if necessary to prevent substantial prejudice, be entitled to a continuance of the trial or hearing sufficient to allow preparation to meet the testimony.
>
> (b) If the court finds that the failure to comply with this section is the result of bad faith on the part of any party or attorney, the court shall impose appropriate sanctions. The remedy of exclusion of the expert's testimony *will only apply if the court finds that a party deliberately violated the provisions of this section.*

*Id.* In other words, the timeliness of Roberts's objection aside, the trial court had no discretion to exclude Social Worker's testimony absent a finding that the State deliberately violated its obligation under the statute to identify Social Worker as an expert witness.

¶38   At oral argument, Roberts contended that two cases— *State v. Bredehoft*, 966 P.2d 285 (Utah Ct. App. 1998), and *State v. Begishe*, 937 P.2d 527 (Utah Ct. App. 1997)—suggested that, despite the plain language of the statute, a court could exclude non-noticed expert testimony without finding that the lack of notice was deliberate. But Roberts's reliance on *Bredehoft* and *Begishe* is misplaced. Section 77-17-13(4)(b) was amended in 2003 to add the statutory language at issue here. Specifically, the express directive limiting the remedy of exclusion of the expert's

testimony to only those cases where a party deliberately violates the statute was added after those cases were decided. *Compare* Utah Code Ann. § 77-17-13(3) (Michie 1995), *with id.* § 77-17-13(4)(b) (LexisNexis Supp. 2003). Thus, to the extent either decision suggests that a court retains discretion to exclude untimely noticed expert testimony even without a finding of bad faith, they have no application here. This case is governed by the statute as amended in 2003, which expressly states that the remedy of exclusion is inapplicable absent a deliberate violation of the statute. *See id.* § 77-17-13(4)(b) (LexisNexis 2012).

¶39    Thus, Roberts's requested remedy—that all of Social Worker's testimony be excluded because no notice had been provided to him that Social Worker would be testifying as an expert—was not a remedy available to him. Although Roberts could have asked for a continuance, Roberts did not argue below that the State's failure to give notice was deliberate or in bad faith, and the court made no such finding. As a result, without more, the most Roberts would have been entitled to under section 77-17-13 was a continuance, which he—apparently as a strategic choice—did not request. *Cf. State v. Perez*, 2002 UT App 211, ¶¶ 39–41, 52 P.3d 451 (holding that a trial court is not required to sua sponte grant a continuance for a violation of section 77-17-13 if the affected party does not request one). Accordingly, we cannot conclude that the trial court exceeded its discretion when it declined to strike all of Social Worker's testimony, because absent evidence of and a finding that the violation was deliberate, the court did not have discretion to grant Roberts's request.[4] *See* Utah Code Ann. § 77-17-13(4)(b).

---

4. Roberts suggests in his reply brief that the State's professed reason for failing to provide notice of Social Worker's testimony could have amounted to a deliberate violation of the notice provision of section 77-17-13(4)(b) and that, if so, "the remedy of exclusion should apply." He also contends that, in any event, the testimony should have been excluded because Social Worker

(continued…)

C.      Ineffective Assistance of Counsel

¶40     Finally, Roberts also argues that his trial counsel was ineffective for not timely objecting to Social Worker's testimony. But given our resolution above, we conclude that the timeliness of his trial counsel's motion is ultimately irrelevant. Even had Roberts's counsel more timely lodged his objection to Social Worker's testimony, the remedy to which he would have been

---

(…continued)

essentially testified that Victim's story was truthful, that Victim had been abused, and that Victim's behaviors conformed with the profile for sexually abused children—all of which, he contends, is inadmissible expert testimony under our supreme court's decision in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989).

However, neither contention was presented to the trial court as a basis to strike Social Worker's testimony. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("In order to preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (brackets, citation, and internal quotation marks omitted)). And both contentions involve issues to which we typically afford significant deference to a trial court. *See, e.g.*, *State v. Daniels*, 2002 UT 2, ¶ 18, 40 P.3d 611 ("Trial courts have primary responsibility for making determinations of fact and must be given deference in their factfinding role because they are in a better position to assess credibility and determine facts than an appellate court is."); *State v. Sheehan*, 2012 UT App 62, ¶ 15, 273 P.3d 417 (stating that "[t]he trial court has wide discretion in determining the admissibility of expert testimony" and that "we disturb the [trial] court's decision to [exclude] expert testimony only when it exceeds the limits of reasonability" (third alteration in original) (citation and internal quotation marks omitted)). As a result, whatever the merits in these contentions, we decline to address them on appeal for the first time.

entitled was a continuance for preparatory purposes; Social Worker's testimony would still have been admitted.

¶41    In this regard, it is significant that Roberts's trial counsel specifically eschewed for tactical reasons the remedy of a continuance. Roberts's counsel asserted in his motion for a new trial that he strategically chose to request exclusion of Social Worker's entire testimony "rather than the mandatory remedy" of a continuance under section 77-17-13 because "the violation came unexpectedly and in the middle of a trial after the two alleged victims had testified," Roberts "had been in jail for nearly 4 years at the moment the violation occurred," and "[a] jury had been selected and the State's case was nearly over." On appeal, Roberts does not contend that counsel's strategic choice to request exclusion rather than a continuance constituted ineffective assistance.[5] *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (explaining that "scrutiny of counsel's performance must be highly deferential" and that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (citation and internal quotation marks omitted)); *see also State v. Moore*, 2012 UT App 227, ¶¶ 6, 8, 285 P.3d 809 (stating that "[a]n ineffective assistance of counsel claim will fail if a conceivable legitimate tactic or strategy can be surmised from counsel's actions" and that "[i]t is not appropriate for an appellate court, in hindsight, to second guess the strategy of defense counsel"

---

5. In oral argument before this court, Roberts suggested otherwise. He claimed that he argued both that his counsel was ineffective for failing to timely object *and* for failing to request a continuance. However, in his briefing he articulates his claim only as "trial counsel's late objection constitutes ineffective assistance of counsel." He does not allege that counsel's failure to ask for a particular remedy—a continuance—constituted ineffective assistance. And to the extent he raises the issue of a continuance, he does so obliquely and only as speculative proof in the alternative that the late objection prejudiced him.

(citation and internal quotation marks omitted)). As a result, Roberts is hard-pressed to demonstrate that his counsel was ineffective for not making a more timely objection to Social Worker's testimony where counsel, for tactical reasons, declined to request the remedy to which Roberts would have been entitled. *See Strickland*, 466 U.S. at 689; *cf. Perez*, 2002 UT App 211, ¶¶ 39–41 (holding that while a party might have the right to a continuance to remedy a violation under section 77-17-13, a party must actually seek that remedy in the event of a violation). Accordingly, we conclude that his ineffective assistance of counsel challenge fails.

### III. Exclusion of Evidence Relating to Grandfather

¶42    Lastly, Roberts argues that the trial court "erred when it excluded evidence" under rule 403 of the Utah Rules of Evidence that Grandfather, a person with whom Victim had at times stayed, "had a history of sexual abuse." He contends that the evidence was sufficiently probative where it fulfilled the "two important purposes" of suggesting that Victim misidentified Roberts as her abuser and that Victim's sexual knowledge came from sources other than Roberts. We disagree.

¶43    Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. We "will not overturn a trial court's finding that the evidence was inadmissible under Rule 403 unless it was beyond the limits of reasonability." *State v. Alonzo*, 932 P.2d 606, 613 (Utah Ct. App. 1997) (brackets, citation, and internal quotation marks omitted), *aff'd*, 973 P.2d 975 (Utah 1998).

¶44    During trial, Roberts attempted to question Grandmother about why she was not "too thrilled" that Victim had spent time with Grandfather. After the State objected on the grounds of relevance and undue prejudice, Roberts advised the court that Grandfather was a registered sex offender who had been

convicted of "five or six counts of sexual abuse of a child." He argued that the evidence of Grandfather's convictions was relevant and probative because "there's a question about identity in addition to whether or not [the abuse alleged by Victim] happened." In response, the State argued that the evidence of Grandfather's prior crimes was irrelevant to the ultimate question of whether Roberts abused Victim and pointed out that "there's been no evidence whatsoever that [Grandfather] has been involved other than [that Victim] and [Victim's cousin] would go over to the house occasionally." The State also argued that it was substantially more prejudicial than probative to admit this evidence.

¶45 The trial court agreed in part with the State. It found that the evidence was at least relevant but that the probative value was "substantially outweighed by the danger of unfair prejudice" where no evidence suggested that Grandfather was tied "to any of the allegations in this particular case." The court also noted that, even if Grandfather had been convicted of child sexual abuse, nothing had been presented comparing the circumstances of those offenses to Victim's allegations of abuse. Accordingly, the court sustained the State's objection.

¶46 We conclude that the court acted within its discretion in excluding evidence that Grandfather had been convicted of child sexual abuse. The probative value of the evidence was minimal, and its prejudicial effect was significant. *See State v. Tarrats*, 2005 UT 50, ¶¶ 46–47, 122 P.3d 581 (concluding that the court did not exceed its discretion in excluding the evidence intended to prove that the rape victim had previously invented a rape claim where the "probative value [of the evidence was] low" because "the facts of the two incidents are so attenuated," and where the "prejudicial effect [was] substantial," because the evidence was likely to confuse the jurors and "lead them to draw improper inferences . . . that would unfairly impact their assessment of the issues"). Grandfather was a third party with no apparent connection to the alleged abuse; as the trial court acknowledged, even if it was true that Grandfather was a registered sex offender

and had sexually abused a child, there was no record evidence tying Grandfather to Victim's allegations or to the ultimate issue at trial—whether Roberts committed the sexual abuse alleged by Victim.

¶47 Indeed, the evidence's lack of a substantive connection to the case is evident from Roberts's arguments on appeal. The primary evidence Roberts relies on to suggest some tie between Grandfather's previous convictions and Victim's allegations is the fact that Victim stated during her CJC interview that she was at Grandfather's house when an incident of abuse occurred. But Victim quickly self-corrected, stating, "I mean, my dad's house," and neither Victim nor any other witness ever placed Grandfather near the scene of the abuse. Without more, Grandfather's convictions did not have probative value to show that Victim mistakenly identified Roberts as her abuser or that Victim's sexual knowledge may have been acquired from another source. In these circumstances, we have no trouble concluding that the evidence of Grandfather's convictions, if admitted, would have done little more than confuse or mislead the jury by clouding the issues actually being tried. *See State v. Martin*, 2017 UT 63, ¶ 52 (concluding that the trial court did not abuse its discretion in excluding the evidence at issue under rule 403 where admitting the evidence "would have required the [trial] court to subject the jury to time-consuming trials within a trial on weak and fundamentally unpersuasive evidence that was highly attenuated from the facts of the case" (citation and internal quotation marks omitted)). Thus, we are unpersuaded that the trial court exceeded its discretion in determining that the potential harm from evidence that Grandfather had been convicted of child sexual abuse would substantially outweigh its probative value where the probative value was based on little more than hollow speculation.

CONCLUSION

¶48 For the foregoing reasons, we affirm the trial court's decisions to admit the CJC interview, deny Roberts's motion to

strike Social Worker's testimony, and exclude evidence related to Grandfather's prior convictions.

———————